Moses PASSER, Plaintiff,

v.

AMERICAN CHEMICAL
SOCIETY, Defendant.

Civ. A. No. 87–1244 SSH.

United States District Court,
District of Columbia.

Aug. 30, 1990.

Thomas R. Gibbon, Raymond C. Fay, Washington, D.C., for plaintiff.

Jerome C. Schaefer, Rockville, Md., for defendant.

## OPINION

STANLEY S. HARRIS, District Judge.

This matter is before the Court on defendant's motion for summary judgment. Plaintiff contends that he was compelled to retire at age 70 in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C.A. § 623 (West 1985 & Supp.1990). Defendant moves for summary judgment on the grounds that plaintiff falls within an exemption to the ADEA which permits compulsory retirement if certain conditions are met. For the reasons set forth below, defendant's motion is granted.

## I. *Background*

Plaintiff Moses Passer was employed by defendant American Chemical Society (ACS) from 1964 until his mandatory retirement on January 30, 1987, plaintiff's 70th birthday. Plaintiff was Director of ACS's Education Division from 1982 until his retirement.

The American Chemical Society, a non-profit corporation chartered by Congress in 1937, provides the government with information and advice in the field of chemistry, and advances chemistry in general. The 140,000 members of ACS include chemists, chemical engineers, and students. In 1987, ACS had a budget of approximately $130 million and employed approximately 1,900 individuals.

The ACS is divided into two co-equal branches: the Chemical Abstracts Service Division in Columbus, Ohio, and the Washington Operations. Some 1,600 individuals are employed in the Columbus, Ohio, office, with approximately 300, including plaintiff, being employed in the national headquarters in Washington, D.C. In 1987, the Washington office received a $50 million budget allocation, while the Columbus operations were budgeted the remaining $80 million.

The American Chemical Society is governed by officers and a 15–member board of directors comprised of ACS members. An executive director oversees the day-to-day management of the entire organization and reports directly to the board. A deputy executive director heads each of the Washington and Columbus branches, and both report directly to the deputy executive director of the ACS.

The Chemical Abstracts Service Division of the ACS is comprised of several sectors.[1] In Washington, operations are also comprised of several sectors, including the Education Division, which was under plaintiff's direction.[2]

Each sector is headed by a director who reports to their respective operation's deputy executive director. Thus, plaintiff, as Director of the Education Division, reported to the Director of Washington Operations. The Education Division was divided into three departments: Educational Services; Research & Development; and Educational Materials. Each of the department heads reported directly to plaintiff.

Plaintiff was scheduled for mandatory retirement on his 70th birthday. However, in late November 1986, plaintiff informed his superiors that he wished to remain employed at ACS in his current or a comparable position. Plaintiff's superiors told him that he would have to retire, especially since his successor had already been hired.

Consequently, plaintiff brought this action alleging that he was compelled to retire at age 70 in violation of the ADEA. Defendant has moved for summary judgment, asserting that plaintiff fell within the exemption to the ADEA which permits the compulsory retirement of employees: (1) who have reached the age of 65; (2) who, for the two years prior to retirement, were employed in a bona fide executive or a high policymaking position; and (3) who are eligible for aggregate annual retirement benefits of at least $44,000 per year.[3]

Plaintiff argues that summary judgment would be inappropriate because there are disputed issues of fact as to whether he functioned as a bona fide executive. Plaintiff also denies meeting the retirement income test.

## II. *Discussion*

Under Rule 56(c) of the Federal Rules of Civil Procedure, a court must grant summary judgment if there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). The court makes this determination by inquiring whether there

---

**1.** Chemical Abstracts is essentially comprised of the following sectors: Business Administration; Production Operations; Research & Development; Editorial; and Marketing.

**2.** Washington Operations are comprised of the following sectors: Marketing; Books and Jour-

nals Division; Financial Operations; Public Policy and Communication; Personnel; Chemical Engineering News; Membership Division; and the Education Division.

**3.** 29 U.S.C.A. § 631(c)(1) (West Supp.1990).

are any genuine factual issues that can be resolved only by a finder of fact, since they may reasonably be resolved in favor of either party. *Id.* at 250, 106 S.Ct. at 2511. The substantive law governing a case identifies those facts which are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. *Id.* at 248, 106 S.Ct. at 2510.

In order to establish that Dr. Passer was a bona fide executive, the defendant must show that plaintiff met the bona fide executive criteria set out in 29 C.F.R. § 541.1 (1989) and 29 C.F.R. § 1625.12 (1989). *See* 29 C.F.R. § 1625.12(d)(1)–(d)(2).[4]

The Court concludes that summary judgment is appropriate, given the parties' agreement on the objective attributes of plaintiff's position as Director of ACS's Education Division. *See Breckenridge v. Bristol–Myers Co.,* 43 Empl.Prac.Dec. (CCH) ¶ 36,989, at 46,800, 1987 WL 15468 (S.D.Ind. Feb. 16, 1987). When the substantive law is applied to these attributes, plaintiff clearly satisfies the bona fide executive requirements, thereby precluding a possible finding that defendant violated the ADEA.

A. *Plaintiff Satisfies the Bona Fide Executive Criteria of 29 C.F.R. § 541.1(a) through (e)*

(1) *Section 541.1(a):* A bona fide executive's "primary duty consists of the management of the enterprise in which he is employed or of a customarily recognized department...."

For purposes of § 541.1(a), primary duty "means, the major part, or over 50 percent, of the employee's time. Thus, an employee who spends over 50 percent of his time in management would have management as his primary duty." 29 C.F.R. § 541.103. While plaintiff maintains that up to 35 percent of his time was spent performing "programmatic"/nonmanagerial functions, under the regulation it is clear that his primary duty was indeed the management of the Education Division.

Plaintiff does not dispute that the Education Division was a customarily recognized department within ACS's organizational structure. *See* Pltf's Ans. to Request for Admissions (Pltf's Adm.) at 23, 24. Thus, there is no dispute that plaintiff's primary duty consisted of managing the ACS's Education Division, a customarily recognized department.

(2) *Section 541.1(b):* A bona fide executive "customarily and regularly directs the work of two or more other employees...."

Plaintiff has admitted on at least two occasions that he directly supervised the work of at least three employees while he was director of the Education Division; the Division employed approximately 25 individuals. Therefore, there can be no dispute as to whether plaintiff satisfied the requirements of § 541.1(b).[5]

(3) *Section 541.1(c):* A bona fide executive "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring or firing and as to the advance-

---

**4.** Section 541.1 was promulgated as a result of the Fair Labor Standards Act of 1938 (codified as amended in scattered sections of 29 U.S.C.). For purposes of the ADEA, a bona fide executive must meet the criteria of 29 C.F.R. § 541.1(a)–(e), and 29 C.F.R. § 1625.12, a regulation promulgated as a result of the ADEA.

**5.** Plaintiff often asserts that a genuine dispute over a material fact exists, when further study would reveal the absence of such a dispute. For example, at his deposition, plaintiff admits to directing the work of two or more employees; yet in the Request for Admissions, plaintiff issues a denial and an admission. To illustrate:

Q: What management responsibilities did you have?
A: I supervised the performance of the three department heads who reported to me. They in turn supervised the performance of the staff associates who reported to them and I of course also supervised the performance of the secretary who reported to me and as they did. In other words we directed the work of the people who reported to us. Collectively this was a—constituted the education division. Passer Dep. at 122.

In the Request for Admissions, plaintiff takes a contrary position:

ment and promotion or any other change of status of other employees will be given particular weight."

At first glance, there appears to be a genuine factual dispute between the parties over plaintiff's authority and impact on employee matters. Plaintiff states that he "did not have authority to hire or fire his immediate subordinates [and] his recommendations did not carry particular weight."[6] Defendant counters by stating that virtually every recommendation made by plaintiff with regard to hiring, firing, promotion, and salary of employees in the Education Division was implemented.[7] A closer examination reveals the absence of a genuine dispute in that plaintiff's recommendations on employee matters were generally accepted by his superiors.

In an effort to show that he did not meet the requirement of § 541.1(c), plaintiff points to two factors. First, plaintiff notes that he could not give his subordinates a raise without the approval of his superiors. Yet, under the regulations, a bona fide executive need not possess unilateral authority on personnel matters. In fact, plaintiff's recommendations need only have received particular weight by his superiors. Plaintiff does not deny that he had the authority to make recommendations on salary matters, Pltf's Adm. at 28, and furthermore, he can offer no specific instance in which a salary recommendation was rejected.

Second, plaintiff points to one instance over his five-year tenure as Director of the Education Division in which he was forced to rewrite a subordinate's performance evaluation to reflect the views of the Washington Operations director.[8] However, plaintiff points to no other instance in which his recommendations on employee matters were not approved. Additionally, plaintiff was not the only one who had his employee evaluations reviewed by a superior. The ACS's performance evaluation system requires two levels of supervisory review and approval. Pltf's Adm. at 39.

Significantly, six months before his retirement, plaintiff ranked Sylvia Ware, who was ultimately selected as his successor, the second best candidate among a list of five candidates on which he commented. Pltf's Adm. at 46. In addition, at the time the former Department of Educational Activities was reorganized, elevated, and redesignated the Education Division of the ACS, plaintiff recommended the three department organizational structure of the Education Division and the employees to be appointed as the department heads. These recommendations were approved and implemented. Pltf's Adm. at 60. Furthermore, plaintiff admits that he had the same authority on employee matters as the heads of all the other units reporting to the director of Washington Operations. Pltf's Adm. at 70.

Under Rule 56(e), the party opposing summary judgment may not rest upon mere allegation or denials of his pleadings, but must set forth specific facts showing that there is a genuine issue for trial. *Liberty Lobby*, 477 U.S. at 256, 106 S.Ct. at 2514. Moreover, there can be no issue for trial unless there is sufficient evidence fa-

---

That throughout the two-year period immediately before his retirement, Dr. Passer directly supervised the job performance of the three department heads who reported to him and who, in turn, supervised the job performance of the Education Division employees who reported to them.
*Response:* Denied. Pltf's Adm. at 72.
In another part of the Request for Admissions, plaintiff admits to supervising four employees:
That throughout the two-year period immediately before his retirement, Dr. Passer direct-

ed the work of between 27 and 3[0] employees in the Education Division.
*Response:* Plaintiff admits that four employees reported directly to him. Pltf's Adm. at 25.

6. Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment (Pltf's Memo.) at p. 17.

7. Defendant's Statement of Material Facts as to Which There Exists No Genuine Issue, No. 7.

8. *See* Pltf's Memo. at p. 8, and Ex. 22 at 6; Passer Dep. at 115.

voring the nonmoving party for a jury to return a verdict for that party. *Id.* at 249, 106 S.Ct. at 2510 (citations omitted). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Id.* at 249–250, 106 S.Ct. at 2510–2511 (citations omitted).

From the undisputed facts above, plaintiff had more than a "marginal role" in employee matters and thus meets the criteria of § 541.1(c). *See Donovan v. Great Lakes Recreation Co.,* 98 Lab.Cas. (CCH) ¶ 34,426, at 45,662, 1983 WL 2057 (E.D. Mich. July 18, 1983). It is this Court's determination that plaintiff has failed to offer significantly probative evidence that his recommendations on employee matters carried little weight. Plaintiff can point to only one instance during his tenure in which his superiors rejected one of his recommendations on an employee matter. The mere existence of a scintilla of evidence in support of plaintiff's position is insufficient to prevent the granting of summary judgment. *Liberty Lobby,* 477 U.S. at 252, 106 S.Ct. at 2512.

(4) *Section 541.1(d):* A bona fide executive "customarily and regularly exercises discretionary powers...."

Section 541.107, the regulation promulgated as an explanatory companion to 29 C.F.R. § 541.1(d), offers some guidance on the discretionary power issue. In pertinent part, § 541.107(a) states: "A person whose work is so completely routinized that he has no discretion does not qualify for the bona fide executive exemption." Section 541.107(b), in pertinent part, continues:

The phrase "customarily and regularly" signifies a frequency which must be greater than occasional but which ... may be less than constant. The requirement will be met by the employee who normally and recurrently is called upon to exercise and does exercise discretionary powers in the day-to-day perform-

ance of his duties. The requirement is not met by the occasional exercise of discretionary powers.

The employee's characterization of his position is relevant. *Breckenridge,* 43 Empl.Prac.Dec. (CCH) at 46,802. Moreover, to establish that an employee regularly exercises discretionary powers, the employer must show that the employee exercised not merely discretion as to the mechanics of performance, but rather discretion as to policy. *Donovan,* 98 Lab.Cas. (CCH) at 45,659 (citations omitted). Given these standards, plaintiff unequivocally falls within the requirements of § 541.1(d) as evidenced by a document he prepared in 1985, entitled "Position Description."[9] In pertinent part, plaintiff underscored his discretionary powers by stating:

The incumbent [Director of the Education Division] is responsible for planning, organizing, and administering existing ACS educational programs, and for designing and initiating new programs through which ACS can strengthen and improve chemical education. Defines long-range goals, recommends policies, and develops objectives for ACS educational activities in accordance with the Society's policies and the changing needs of its members, and in harmony with national trends and evolving directions in science education.

The incumbent provides coordination, guidance, liaison, and support services for the following non-staff ACS governance units active in chemical education: the Society Committee on Education; the educational components of the Board, Council, and other member committees; the Division of Chemical Education; and the education committees of ACS local sections. Interacts with non-ACS organizations with comparable programs including other associations, academe, industry, and government.

The incumbent develops the Divisional staff organization, and outlines the responsibilities and functions of the depart-

---

**9.** *See* Defendant's Memorandum in Support of Motion for Summary Judgment (Deft's Memo.) at Ex. 17.

ment heads. The individuals who report to the incumbent work under general direction, and receive guidance in establishing new programs. Program activities and progress are discussed with them in regular meetings, and are set forth in periodic progress reports. The incumbent reviews drafts of major documentation generated by these persons.

The incumbent has wide latitude in the general management of ongoing programs within broad policies set forth by the ACS Board of Directors, the Executive Director, and the Deputy Executive Director. Keeps the Deputy Executive Director informed on a continuing basis of the progress of the programs, of existing and anticipated problems, and of proposed major changes in direction. Seeks his/her advice and approval in developing: policy recommendations for submission through the Executive Director to the Board of Directors; annual budgets; proposals for new programs; major staff assignments and changes; and salary recommendations.

■ The fact that an employee's work is subject to approval or reversal by a higher level of management does not detract from the discretionary and judgmental nature of the work. *Breckenridge*, 43 Empl.Prac. Dec. (CCH) at 46,803 (citations omitted). Significantly, plaintiff has admitted that his policy recommendations were generally accepted by his superiors.[10]

In sum, there is no dispute that plaintiff customarily and regularly exercised discretionary powers in his position as Director of the Education Division.

(5) *Section 541.1(e):* A bona fide executive cannot "devote more than 20 percent ... of his hours of work in the workweek to activities which are not directly and closely related to the performance of the work described in paragraphs (a) through (d)...." of section 541.1.

The purpose of this fifth prong of the bona fide executive test is to ensure that certain lower level employees do not fall through the cracks of the first four prongs of § 541.1. *Breckenridge*, 43 Empl.Prac. Dec. (CCH) at 46,803.

Again, there may appear to be a dispute between the parties as to whether plaintiff meets the requirements of § 541.1(e). Plaintiff contends that he spent approximately 65 percent of his time on the management functions described in paragraphs (a) through (e), and 35 percent of his time on "programmatic"/non-executive functions. Defendant counters by pointing to the depositions of plaintiff's subordinates who testified that plaintiff's "programmatic" functions did not exceed a level of 5 to 10 percent of his time.

Under *Liberty Lobby*, credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are functions of the jury, not of the court. 477 U.S. at 255, 106 S.Ct. at 2513. The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor. *Id.* (citations omitted). Therefore, the Court must take as true plaintiff's estimation that he spent 35 percent of his time on "programmatic" functions.

For present purposes, though, this time issue is irrelevant. Plaintiff's descriptions

---

**10.** Plaintiff stated the following at his deposition:

Q: Were there any goals that you wanted to achieve or policies that you wanted to put in place that you were told by Mr. Dunn [plaintiff's direct superior, the Deputy Executive Director of Washington Operations from 1986 until Dr. Passer's retirement] that he objected to those goals or those policies?

A: I don't remember any. Passer Dep. at 166.

&ast; &ast; &ast; &ast; &ast; &ast;

Q: Do you have any recollection of any goals that you wanted to set or policies that you

wanted to implement that Dr. Wigington [the Deputy Executive Director of Washington Operations from 1984–1986] told you no, you could not follow those goals or implement those policies?

A: I'm sure there were occasions when Dr. Wigington—I am sure there were occasions when Dr. Wigington disagreed with something I proposed or I was not all that happy with something he wanted me to do but nothing that important that it sticks in my mind. *Id.*

of his so-called "programmatic" activities demonstrate the very close relationship between plaintiff's "programmatic" functions and his managerial functions, thus in effect negating the significance of any distinction.[11]

On two separate occasions, plaintiff offered different explanations for undertaking "programmatic" duties. In his deposition, plaintiff stated:

> Programmatic work is the idea of researching ideas and writing proposals all by myself and then taking them to the next level. But I mean it's the sort of thing which if we were much larger, I wouldn't have time to do. But it's a sort of thing if you're a small department, you don't have enough people to do so you do a lot of it yourself. Passer Dep. 156.

However, in an answer to an interrogatory, plaintiff stated:

> [The] Education [Division] was the smallest division in ACS, which meant that its administrative burden was substantially less than that of the larger divisions, thereby permitting the Director to provide the required basic programmatic services in much the same fashion as other professional staff members in the Education Division. Pltf's Response to First Set of Continuing Interrogatories (Interrogatory 10, p. 8).

Again, it seems as if plaintiff is the only one disputing the material facts. Nonetheless, whatever his reasons for taking on the "programmatic" duties, the Court will

not allow Dr. Passer to disavow the attributes of his position by seeking to prove, for example, that he had to take on additional "programmatic" duties due to the size of the Education Division. *See Breckenridge,* 43 Empl.Prac.Dec. (CCH) at 46,799–800 (a plaintiff by delegation to subordinates or simple inaction may not have exercised all of the authority conferred upon him, yet this does not detract from the existence of such authority).

Finally, plaintiff himself believed that doing "programmatic" work would make him a "better manager." Pltf's Adm. at 78. Moreover, plaintiff stated that he performed the "programmatic" functions as these "were things that needed to be done, they advance the purposes of [the] division equally well but somebody had to do them." Passer Dep. at 156–57. In sum, there is no dispute that plaintiff devoted at least 80 percent of his time to managerial functions.

B. *Plaintiff satisfies the bona fide executive criteria of 29 C.F.R. § 1625.12*

As a matter of law, plaintiff qualifies as a bona fide executive under 29 C.F.R. § 541.1. However, under the ADEA, even if the employee satisfies the requirements under § 541.1, the bona fide executive exemption may not be claimed unless the employee meets additional criteria. These criteria, specified in the conference report to the ADEA, are incorporated into 29 C.F.R. § 1625.12.[12]

---

**11.** In the interrogatories, plaintiff reveals the absence of a distinction between his "programmatic" and managerial functions. To illustrate:

*Academic/Industrial Education.* Worked with Education staff to develop the proposal to phase down the Cooperative Education program and in its place develop a new Academic/Industrial Education program. Interrogatory 10, p. 9.

Plaintiff's role in this program can certainly qualify under the criteria of § 541.1(b), which requires that the bona fide executive direct the work of other employees.

*ACS Chemistry Olympiad.* Worked with the cognizant governance committees in the initial planning for this program; was actively involved in writing the formal proposal for its establishment; and then, when the program was first initiated, was actively involved in helping get it started.

Met with General Electric Foundation staff members and participated in other ways in the negotiations that led to a major grant in support of this program. Interrogatory 10, p. 10.

Plaintiff's role in this program surely meets the criteria of § 541.1(d) in that, by his own description, this is not routinized work in which the bona fide executive has no discretionary authority.

**12.** The regulation, 29 C.F.R. § 1625.12(d)(1)–(d)(2), in pertinent part, states as follows:

> In order for an employee to qualify as a "bona fide executive," the employer must initially show that the employee satisfies the definition of a bona fide executive set forth in § 541.1 of

Defendant's organizational structure and a number of undisputed facts clearly indicate that plaintiff satisfies the legislative intent of the conference report language.

The ACS organizational chart shows that the Education Division is on the same organizational plane as the marketing, financial operations, production operations, and personnel divisions.[13] The conference report states that the heads of major departments such as finance and marketing, are not to be considered middle management. While the report does not specifically include "Education Division", its parity within ACS's organizational structure with the named operations satisfies the legislative intent. Plaintiff also had the same authority as the directors of the co-equal sectors listed above. *See* Passer Dep. 121; Pltf's Adm. at 70; footnotes 1 & 2, *supra.* In any event, the organizational structure of ACS makes clear that the position in question has bona fide executive rank.[14]

In an effort to show that he does not meet the additional criteria of a bona fide executive as set forth in § 1625.12, plaintiff seeks to characterize the size of the Education Division budget and staff as insignificant. Plaintiff points to one part of

§ 1625.12(d)(2) which states that the exemption applies to "a very few top level employees who exercise substantial executive authority over a significant number of employees and a large volume of business."

Plaintiff's use of this language has been taken out of context. The conference report and the regulation, when read in their entirety, are more concerned with the bona fide executive's duties, rather than how many employees he or she has in the division. The question of whether Dr. Passer fell within the exemption should be made with reference to the nature of the duties, responsibilities, and authority conferred upon him. *Breckenridge*, 43 Empl.Prac. Dec. (CCH) at 46,799. Moreover, the Education Division budget of approximately $4 million per year is hardly insignificant.

Plaintiff also points to the fact that he was not a member of the ACS's Management Council as evidence that he lacked bona fide executive status. The Council members included the Executive Director, the Deputy Executive Director, the Treasurer and the Directors of the Washington and Columbus operations.[15] While plaintiff

this chapter. Each of the requirements in paragraphs (a) through (e) of § 541.1 must be satisfied, regardless of the level of the employee's salary or compensation.

Even if an employee qualifies as an executive under the definition in § 541.1 of this chapter, the exemption from the ADEA may not be claimed unless the employee also meets the further criteria specified in the Conference Committee Report in the form of examples (see H.Rep. No. 950, 95th Cong., 2nd Sess. 9 (1978)). The examples are intended to make clear that the exemption does not apply to middle-management employees, no matter how great their retirement income, but only to a very few top level employees who exercise substantial executive authority over a significant number of employees and a large volume of business. As stated in the Conference Report:

Typically the head of a significant and substantial local or regional operation of a corporation [or other business organization], such as a major production facility or retail establishment, but not the head of a minor branch, warehouse or retail store, would be covered by the term "bona fide executive." Individuals at higher levels in the corporate organizational structure who possess comparable or greater levels of responsibility and authority

as measured by established and recognized criteria would also be covered.

The heads of major departments or divisions of corporations [or other business organizations] are usually located at corporate or regional headquarters. With respect to employees whose duties are associated with corporate headquarters operations, such as finance, marketing, legal, production and manufacturing (or in a corporation organized on a product line basis, the management of product lines), the definition would cover employees who head those divisions.

13. Pltf's Memo. at Ex. 35.

14. In *Whittlesey v. Union Carbide Corp.,* 567 F.Supp. 1320 (S.D.N.Y.1983), *aff'd* 742 F.2d 724 (2nd Cir.1984), the court was faced with a situation in which the organizational charts and job descriptions did not answer the statutory questions as to whether the plaintiff held bona fide executive rank. *Id.* at 1328.

15. Between 1985 and 1989, the Council met formally between four and seven times a year. Issues discussed ranged from smoking policies to budget planning projections to the ACS's health insurance policies.

was not a member of the Council, he was a member of the Washington Operations Management Group, the most senior management committee within Washington Operations. The Group included the heads of the eight major Washington Operations sectors and usually met every other week.

In *Colby v. Graniteville Co.*, 635 F.Supp. 381 (S.D.N.Y.1986), plaintiff was on many committees, but they were within a division of the defendant company.[16] Yet, the court refused to let plaintiff minimize his involvement. *Colby*, 635 F.Supp. at 385–386. Similarly, Dr. Passer cannot baldly minimize his status as a key executive on the Management Group. *See id.* at 385.

■ A number of other undisputed factors also tend to show that plaintiff was not a middle-level employee, but was indeed a bona fide executive. First, in 1986, and until his retirement in 1987, plaintiff earned $82,200 per year, making him the tenth highest paid ACS employee. Plaintiff was the sixth highest paid employee within Washington Operations. While a high salary is not determinative as to whether a position comes within the bona fide executive exemption, *Whittlesey*, 567 F.Supp. at 1326, it is one of a number of factors to consider. *Colby*, 635 F.Supp. 381, 385 (S.D.N.Y.1986).

Second, under the ACS's constitution, the director of the Education Division was only one of six executive positions that required confirmation by the ACS board of directors. The directors of the Washington and Columbus Operations were among the six offices that required board approval as well.

Third, under the Hay point system used by the ACS to evaluate and rank positions on the 1,900–member ACS staff, plaintiff had the seventh highest score. This score was comprised of job knowledge required,

problem-solving responsibility, and accountability.[17]

Finally, plaintiff notes, by citing *Breckenridge* and *Colby*, that the payment of country club dues and other such perquisites are relevant in determining bona fide executive status. Plaintiff points out that the ACS provided cars and paid the club dues of only three ACS executives: the Executive Director, the Deputy, and the head of Washington Operations.

Plaintiff, however, has neglected to mention in his memorandum a number of interesting and undisputed facts. The ACS paid plaintiff's membership dues in seven organizations. Pltf's Adm. at 38. It is true that the ACS refused to pay for plaintiff's Cosmos Club membership. However, plaintiff made his request for that over 20 years ago, and at a time when he was not the Director of the Education Division. *Id.* at 40. Furthermore, plaintiff fails to mention that he was eligible to make business-related use of private clubs under memberships held in the names of other ACS employees. *Id.* at 42. Plaintiff also does not mention that since becoming Director of the Education Division in 1982, he never asked the ACS to provide him with the use of a car or to pay for his Cosmos Club membership. *Id.* at 40.

C. *Plaintiff is entitled to a retirement benefit of $44,000 per year, as required by 29 U.S.C. § 631(c)(1).*

In order to be a bona fide executive under the ADEA, the individual must be entitled to a nonforfeitable pension of at least $44,000 per year. Plaintiff does not dispute that he is actually receiving a monthly retirement benefit of $2,782.81, based upon his selection of an Optional Life Annuity with 180 guaranteed payments. Pltf's Adm. at 111. This annual pension benefit of $33,393.72 is actuarily equivalent

---

**16.** The defendant in *Colby*, the Graniteville Co., had a McCampbell Sales Division. The plaintiff was the Senior Vice President of Finance and Administration of the McCampbell Division. The division was under the direction of a president. *Colby*, 635 F.Supp. at 382, 386. The court granted summary judgment and ruled, inter alia, that plaintiff was a bona fide executive.

**17.** Plaintiff argues that since defendant never formally adopted the system, and because the number of Hay points necessary for bona fide executive status was never determined, the score should be disregarded. Yet, the fact remains that when compared to other ACS employees, plaintiff's high score reveals that he held a great deal of executive authority and responsibility. A middle-level manager would not have such a high score.

to a $44,689.80 straight life annuity.[18] Rather, plaintiff disputes defendant's calculation of the retirement benefit. Plaintiff contends that he is only entitled to an actuarily equivalent annual retirement benefit of $43,683.60, an amount that is $316.40 below the statutory minimum.

The dispute between the parties arises over how to properly calculate the social security offset under the ACS's pension plan. Prior to plaintiff's retirement, his pension calculation was based upon an offset of $679 per month, thus resulting in the $43,683.60 pension. However, the final pension estimate used a social security offset of $476, thereby resulting in the actuarily equivalent pension of $44,600.

The Court is not presented here with a situation such as that in *Tatarian v. Oneida Ltd.*, No. 83–3075–W (D.Mass. Nov. 23, 1985) (LEXIS, Genfed library, Dist. file), wherein the characterization of a $45,000 payment was in dispute. In that case, plaintiff argued that the payment could not be included in the calculation of the retirement pension because it was not immediate, nonforfeitable and from a "pension, profit-sharing, savings, or deferred compensation plan" as required by 29 U.S.C.A. § 631(c)(1). Plaintiff argued that the payment constituted salary, or alternatively, that it was consideration for a noncompetition agreement. *Id.*

In the case at bar, there is a disagreement over how to properly interpret the quite complicated offset provision in the ACS's pension plan. However, neither side disputes that plaintiff is actually receiving a pension actuarily worth more than $44,000, nor is there a dispute over the characterization of the pension payments. Congress required a $44,000 pension for an employee to qualify as a bona fide executive, and Congress' intent is not being thwarted when plaintiff is actually receiving more than $44,000.

SO ORDERED.

---

18. 29 U.S.C.A. § 631(c)(2) permits the actuarily equivalent calculation.