**Moses PASSER, Appellant,**

v.

**AMERICAN CHEMICAL SOCIETY, Appellee.**

No. 90–7166.

United States Court of Appeals, District of Columbia Circuit.

Argued May 14, 1991.

Decided June 11, 1991.

Raymond C. Fay, with whom Thomas R. Gibbon was on the brief, Washington, D.C., for appellant.

Jerome C. Schaefer, with whom Carl Roberts, was on the brief, Washington, D.C., for appellee.

Michael Keller, Attorney, E.E.O.C., with whom Donald R. Livingston, Acting Gen. Counsel, Gwendolyn Young Reams, Associate Gen. Counsel, and Vincent J. Blackwood, Asst. Gen. Counsel, were on the brief, Washington, D.C., for amicus curiae urging that the District Court's judgment be reversed and the case be remanded to the District Court.

Before EDWARDS, BUCKLEY and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge HARRY T. EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

The appellant, Dr. Moses Passer, brought this employment-discrimination action after his former employer, the American Chemical Society, forced him to retire on his 70th birthday and then cancelled a public event in his honor after it learned he had filed charges challenging his forced retirement. On appeal, Dr. Passer challenges three rulings of the District Court striking down his age-discrimination and retaliation claims under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 et seq. (1988), and the District of Columbia Human Rights Act ("the D.C. Act"), D.C.CODE ANN. § 1–2501 et seq. (Repl.1987). With regard to his age-discrimination claim under ADEA, he argues that the District Court erroneously applied a statutory exemption which permits employers to compel the retirement of "bona fide executive[s]" who are at least 65 years old. See 29 U.S.C. § 631(c)(1) (1988). With regard to his reprisal claims under ADEA and the D.C. Act, Dr. Passer argues that the District Court erred in holding, as a matter of law, that an employer's cancellation of a public event honoring an employee cannot constitute a retaliatory act within the meaning of the federal and District of Columbia statutes.

Dr. Passer's appeal is meritorious on both counts. Therefore, we reverse the District Court's disposition of both his claims under the federal act. Finding alternative grounds, however, supporting the trial court's dismissal of Dr. Passer's reprisal claim under the D.C. Act, we affirm that portion of the District Court's judgment.

## I. BACKGROUND

In 1964, Moses Passer left his job as a chemist at the University of Minnesota to begin a new career with the American Chemical Society ("ACS" or "the Society") at its Washington, D.C., headquarters. From the time of his hiring until his invol-untary retirement in 1987, Dr. Passer served as the Director of ACS's Education Division,[1] where he was in charge of the Society's chemical education programs.

In accordance with pre-existing ACS policy, Dr. Passer was expected to retire no later than his 70th birthday in January 1987. On October 17, 1986, however, Congress amended ADEA, extending its protections for the first time to persons over age 70. See Age Discrimination in Employment Amendments of 1986, Pub.L. No. 99–592, § 2(c), 100 Stat. 3342. As a result of these amendments, effective January 1, 1987, employers could not enforce mandatory retirement policies, except when acting pursuant to a bona fide, age-related occupational qualification, some other statutory defense, or one of the Act's specific exemptions.

In late November 1986, Dr. Passer informed ACS that he wished to continue working beyond his 70th birthday. ACS rejected this request and notified Dr. Passer that he would be replaced, as originally planned, on his next birthday. ACS contended that it was entitled to compel Dr. Passer's retirement, notwithstanding the extension of ADEA to persons of Dr. Passer's age, because he qualified as a "bona fide executive" within the meaning of a narrow exemption to the statute. Under this exemption, employers may require the retirement, at age 65 or older, of certain "bona fide executive[s who are] ... entitled to an immediate nonforfeitable annual retirement benefit ... [of] at least $44,000." 29 U.S.C. § 631(c)(1) (1988).

On January 30, 1987, when Dr. Passer turned 70, ACS terminated his employment. The next week, Dr. Passer filed charges of age discrimination against ACS with the U.S. Equal Employment Opportunity Commission ("EEOC") and the District of Columbia Office of Human Rights.

Dr. Passer's claims of retaliation arise from a related course of events. In the fall of 1986, ACS informed Dr. Passer that it

---

**1.** When Dr. Passer was hired in 1964, the Education Division was called the Education Department. In the early 1980s, the Department's name was changed to the Education Division as part of a general restructuring at ACS. Dr. Passer contends that his job duties were not affected by this change. See Brief for Plaintiff–Appell[ant] Moses Passer at 12.

was planning a special symposium in his honor at the Society's next annual membership meeting in early April 1987. This was, as both litigants readily acknowledge, a "rare and prestigious" laurel for an ACS employee; indeed, it was "one of the highest honors that could have been bestowed upon him by his peers." *See* Brief for Plaintiff–Appell[ant] Moses Passer ("Passer Br.") at 4, 14; Brief for Defendant–Appellee American Chemical Society ("ACS Br.") at 40. Eight distinguished chemists agreed to give papers on the occasion and an announcement of the event was provided to the several thousand ACS members planning to attend the annual conference. *See* Schedule of Events, ACS 193d Nat'l Mtg., Apr. 5–10, 1987, *reprinted in* Appendix ("App.") 93, 95, 96, 97.

Dr. Passer asserts that, following his termination in January, he looked forward with growing anticipation to the April symposium. By his account, the gathering of his professional peers from around the country at the symposium in his honor would provide an excellent opportunity to renew acquaintances and make contacts that might lead to new employment.

The ASC annual conference opened in Denver on Sunday, April 5, 1987. Late that afternoon, as Dr. Passer was preparing to leave Washington for the conference the next morning, he received a call at home from Ronald G. Dunn, his former superior at ACS. Mr. Dunn informed Dr. Passer that ACS was indefinitely postponing the Passer Symposium. According to Dr. Passer, Mr. Dunn said he "wanted me to have this information in case I might want to change my travel plans" for the following morning. *See* Declaration of Moses Passer at 3, *Passer v. American Chem. Soc'y*, Civ. Action No. 87–1244 (D.D.C. Apr. 6, 1989), *reprinted in* App. 85, 87. Dr. Passer then cancelled his plane reservations and did not attend the conference.

The following afternoon, one day before the scheduled event, ACS notified the other speakers who had agreed to participate in the Passer Symposium that the event was being cancelled. At the request of ACS, all of the speakers (including Dr. Passer) agreed to withdraw their papers so that the action could be announced as a "voluntary cancellation" by the Division of Chemical Education rather than as a "unilateral action" by the ACS Board. *Id.* at 4, *reprinted in* App. 88. ACS freely admits that its decision to cancel the symposium was prompted by Dr. Passer's filing of discrimination charges; it insists, however, that it was motivated simply by legal prudence and not by any desire to harm or publicly humiliate Dr. Passer. *See* ACS Br. at 42 ("[T]here is no dispute that its [the symposium's] not being held was occasioned by Passer's efforts to avoid being retired by ACS."); Minutes of Executive Committee Meeting, ACS Division of Chemical Education (Aug. 29, 1987) (stating that "[t]he Society's attorney said that the ACS Board would be remiss to allow this symposium to take place, since Mike [Passer] was suing ACS for age discrimination, and presentations made at the symposium might inadvertently affect the suit"), *reprinted in* App. 98.

Dr. Passer brought suit in District Court under ADEA and the D.C.Human Rights Act. He alleged that his forced retirement from ACS was "because of ... age" and therefore violative of both ADEA and the prohibition on age-based employment discrimination found in the D.C. Act; he also alleged that ACS's action in abruptly cancelling [2] the symposium in his honor was "in retaliation for his having filed an age discrimination complaint" and "made him essentially unemployable in his field," in violation of the anti-retaliation provisions set out in the federal and D.C. acts. *See* Passer Br. at 15.

The District Court, in a series of three decisions over two years, ruled against Dr. Passer on all counts. In its memorandum

---

**2.** In its brief, ACS objected to Dr. Passer's assertion that ACS had "cancelled" the symposium, insisting that it had only indefinitely "postponed" it. As ACS itself appears to concede, however, this contention is "nothing more than a semantic quibble," *see* ACS Br. at 42, given that the symposium was in fact not held at the April 1987 conference and that ACS has no plans to reschedule it.

and order of November 18, 1988, the District Court dismissed Dr. Passer's challenge to his retirement under the D.C. Human Rights Act on the grounds that the Act prohibits age-based employment discrimination only against individuals between the ages of 18 and 65. *Passer v. American Chem. Soc'y*, 701 F.Supp. 1, 3 (D.D.C.1988); *see* D.C.CODE ANN. §§ 1–2512(a)(1), 1–2502(2) (Repl.1987). Since Dr. Passer was 70 at the time of his discharge, he fell outside the D.C. statute's protections. Dr. Passer does not contest this ruling.

The District Court also dismissed Dr. Passer's reprisal claims under ADEA and the D.C. Act, ruling that "defendant's alleged conduct—cancelling a symposium honoring plaintiff—is not retaliation as intended by the [statutes]" *Passer*, 701 F.Supp. at 3. "Although in honor of plaintiff's service, the symposium was not part of plaintiff's past or future employment relationship with defendant, nor did the cancellation affect his relationship with potential employers," *id.*, and therefore was not the sort of retaliatory penalty prohibited by the statutes. Accordingly, the trial court dismissed Dr. Passer's reprisal claims under Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim upon which relief can be granted. The District Court reaffirmed this ruling in a subsequent order denying Dr. Passer's motion for reconsideration. *See Passer v. American Chem. Soc'y*, Civ. Action No. 87–1244 (D.D.C. Apr. 6, 1989), *reprinted in* App. 14.

Finally, on August 30, 1990, the District Court granted summary judgment against Dr. Passer's only remaining claim—his allegation that his forced retirement violated ADEA's prohibition of age discrimination in employment. *See Passer v. American Chem. Soc'y*, 749 F.Supp. 277 (D.D.C.1990). The court ruled that Dr. Passer plainly fell within ADEA's "bona fide executive" exemption permitting the mandatory retirement of certain top-ranking executives over the age of 65.

Dr. Passer now appeals the trial court's grant of summary judgment against his ADEA age-discrimination claim and its dismissal of his retaliation claims under ADEA and the D.C. Act.

## II. ANALYSIS

### A. *The Age–Discrimination Claim*

There is no dispute that Dr. Passer's employment with ACS was terminated "because of ... age" within the meaning of ADEA. *See* 29 U.S.C. § 623(a)(1) (1988) ("It shall be unlawful for an employer ... to discharge any individual ... because of such individual's age."). The controlling question then is whether Dr. Passer qualifies as a "bona fide executive" within the meaning of the exemption set out in 29 U.S.C. § 631(c).

#### 1. *The "Bona Fide Executive" Exemption*

ADEA's "bona fide executive" exemption provides:

> Nothing in this chapter shall be construed to prohibit compulsory retirement of any employee who has attained 65 years of age and who, for the 2–year period immediately before retirement, is employed in a bona fide executive or a high policymaking position, if such employee is entitled to an immediate nonforfeitable annual retirement benefit from a pension, profit-sharing, savings, or deferred compensation plan, or any combination of such plans, of the employer of such employee, which equals, in the aggregate, at least $44,000.

29 U.S.C. § 631(c)(1) (1988).

As the statutory language makes clear, this exemption contains two separate requirements, both of which must be satisfied before an employer may force an employee to retire: (1) the employee must have served for two years immediately before retirement in a "bona fide executive" position within the meaning of the statute; and (2) the employee must be "entitled" to a minimum retirement income as calculated in the statute and accompanying regulations. Dr. Passer contends that he fails both prongs of this test.

### a. *Job–Functions Prong*

We find ample support for the District Court's conclusion that, based on the undisputed facts of this case, Dr. Passer qualified as a "bona fide executive" in terms of his job duties.

To be a "bona fide executive" within the meaning of ADEA, an employee's job functions must satisfy (1) the threshold standards set out in regulations defining a "bona fide executive" under the Fair Labor Standards Act ("FLSA"), 29 C.F.R. § 541.1 (1990), and (2) additional descriptive criteria set out in the regulations accompanying ADEA, 29 C.F.R. § 1625.12(d)(2) (1990).[3]

Dr. Passer freely concedes that, as Director of ACS's Education Division, he satisfied the FLSA standards for determining whether he was a "bona fide executive." *See* Passer Br. at 17, 27, 30.[4] Consequently, the only remaining issue is whether he also fell within the additional descriptive criteria set out in the regulations promulgated pursuant to ADEA. Those criteria are mostly illustrative and are meant to emphasize that Congress intended the exemption to reach "only ... a very few top level employees who exercise substantial executive authority over a significant number of employees and a large volume of business." 29 C.F.R. § 1625.12(d)(2); *see also* H.R.CONF.REP. No. 950, 95th Cong., 2d Sess. 9, *reprinted in* 1978 U.S.CODE CONG. & ADMIN.NEWS 530–31. By contrast, the statutory exemption was *not* intended to permit the compulsory retirement of "low-level managers, supervisors, or blue collar workers," H.R.CONF.REP. No. 950, 95th Cong., 2d Sess. 9, *reprinted in* 1978 U.S. CODE CONG. & ADMIN.NEWS 530, or even of "middle-management employees," 29 C.F.R. § 1625.12(d)(2).

The House–Senate Conference Report, incorporated largely verbatim into the regulations drafted by the EEOC, elaborated on the distinction as follows:

> Typically the head of a significant and substantial local or regional operation of a corporation [or other business organization], such as a major production facility or retail establishment, but not the head of a minor branch, warehouse or retail store, would be covered by the term "bona fide executive." ...

> The heads of major departments or divisions of corporations [or other business organizations] are usually located at corporate or regional headquarters. With respect to employees whose duties are associated with corporate headquarters operations, such as finance, marketing, legal, production and manufacturing ..., the definition would cover employees who head those divisions.

*Id.* (quoting H.R.CONF.REP. No. 950, 95th Cong., 2d Sess. 9 (1978), U.S.CODE CONG. & ADMIN.NEWS 531; bracketed material added by regulations).

What little case law exists applying this provision provides only modest additional guidance: it has been held, for example,

---

**3.** *See, e.g., Colby v. Graniteville Co.,* 635 F.Supp. 381, 384 (S.D.N.Y.1986); *Whittlesey v. Union Carbide Corp.,* 567 F.Supp. 1320, 1322 (S.D.N.Y. 1983), *aff'd,* 742 F.2d 724 (2d Cir.1984). The latter regulations track the criteria set forth in the undisputed legislative history that purports to define the "bona fide executive" exception under ADEA. *See* 29 C.F.R. § 1625.12(d); H.R. CONF.REP. No. 950, 95th Cong., 2d Sess. 9 ("The conferees agree that to fa[l]l within the test the employee must be a bona fide executive as defined in 29 C.F.R. 541.1 [the FLSA regulations] and in addition meet the criteria described below."), *reprinted in* 1978 U.S.CODE CONG. & ADMIN. NEWS 504, 528, 530–31. Neither party disputes that the regulations reflect a lawful interpretation of the statute.

**4.** The district court in *Colby, supra* note 3, ably summarized these standards:

> To establish that plaintiff was a "bona fide executive" as defined in the [FLSA] regulations, defendant must show that plaintiff meets each of the following requirements: plaintiff's primary duty consists of the management of the enterprise or of a department or subdivision [thereof]; plaintiff customarily and regularly directs the work of two or more other employees therein; plaintiff has the authority to hire or fire other employees or his suggestions as to hiring, firing, advancement and promotion of other employees are given particular weight; plaintiff customarily and regularly exercises discretionary powers; and plaintiff does not devote more than 20% of his time to activities which are not directly and closely related to the performance of the work described above.

> 635 F.Supp. at 384 (footnote omitted).

that the general counsel of a corporate subsidiary [5] and a senior vice president of finance and administration for a corporation's sales division [6] *are* "bona fide executives" under ADEA, while the chief labor counsel of a corporation who exercised only minimal authority over four other attorneys is not.[7]

◼ Dr. Passer contends that the District Court erred in finding that his job duties made him more than a "middle-management employee" of ACS. We disagree. It is undisputed that Dr. Passer was the head of ACS's Education Division, one of 12 divisions that perform the Society's core functions. As such, Dr. Passer was in charge of the division's 25 to 30 employees and its budget of $4 million. Only three superiors stood between Dr. Passer and the Board of Directors, ACS's ultimate governing body.[8] At the time of his retirement, Dr. Passer's salary ranked him as ACS's tenth highest paid employee out of a total work force of 1,900. An official "Position Description" for Dr. Passer's job prepared in February 1985 stated that, as Director of the Education Division, "[t]he incumbent is responsible for planning, organizing, and administering existing ACS educational programs, and for designing and initiating new programs"; it also stated that "[t]he incumbent has wide latitude in the general management of on-going programs within broad policies set forth by the ACS Board of Directors, the Executive Director, and the Deputy Executive Director." *See* Position Description, *reprinted in* Supplemental Appendix ("S.A.") 1, 1–2. Moreover, an advertisement seeking a replacement for Dr. Passer, published in anticipation of his retirement and reviewed in advance by Dr. Passer, described Dr. Passer's post as "[a] key management position" at ACS. S.A. 4.

Based on these uncontested facts, we find that the District Court was justified in ruling that Dr. Passer satisfied the job-functions prong of ADEA's "bona fide executive" exemption.

Dr. Passer's arguments to the contrary —*e.g.*, that he had little final authority over personnel and budget matters and spent a good deal of his time on non-managerial tasks—carry little weight given his concession that he satisfied the FLSA job-functions criteria. *Cf. Colby*, 635 F.Supp. at 386 ("Colby's self-serving, self-deprecating statements [about his assertedly limited job authority] do not overcome the factual evidence establishing that he was a key executive of McCampbell."). His final contention—that extending the "bona fide executive" provision to cover him would defy Congress' intention to exempt only "a very few top level employees"—is also unpersuasive. By Dr. Passer's calculations, there are 18 ACS employees (out of a total of 1,900) at his managerial level or above; reading the statutory exemption to reach less than one percent of ACS's work force simply does not stretch the exemption beyond Congress' discernible intentions.

We therefore uphold the trial court's finding that Dr. Passer satisfied the job-functions prong of ADEA's "bona fide executive" exemption.

#### b. *Retirement–Income Prong*

◼ The second prong of ADEA's "bona fide executive" exemption requires that Dr. Passer, at the time of his retirement, have been "entitled to an immediate nonforfeitable annual retirement benefit from a pension, profit-sharing, savings, or deferred compensation plan ... [of] at least $44,000." 29 U.S.C. § 631(c)(1). The litigants sharply contest whether Dr. Passer was entitled, by the terms of the governing

---

5. *See Breckenridge v. Bristol–Myers Co.,* 43 Fair Empl.Prac.Cas. (BNA) 1011, 1987 WL 15468 (S.D.Ind.1987).

6. *See Colby v. Graniteville Co.,* 635 F.Supp. 381 (S.D.N.Y.1986).

7. *See Whittlesey v. Union Carbide Corp.,* 567 F.Supp. 1320 (S.D.N.Y.1983), *aff'd,* 742 F.2d 724 (2d Cir.1984).

8. Dr. Passer reported directly to the ACS's Director of Washington Operations. That officer reported to the Society's Deputy Executive Director, who in turn reported to the Executive Director and, from there, the Society's Board of Directors. *See* ACS Organizational Chart, *reprinted in* App. 55, 56.

ACS pension plan, to sufficient retirement income to satisfy this requirement.

The amount of income a retired employee is due under the ACS pension plan is determined in part by a separate estimation of the Social Security benefits to which the employee will be legally entitled upon retirement. The sum of these benefits is then deducted as an offset to the pension benefits due the employee under the ACS plan. Dr. Passer alleges that ACS manipulated its calculation of his projected Social Security offset to inflate his ACS pension income over the $44,000 threshold required by the statute. According to Dr. Passer, ACS, until shortly before his retirement, consistently calculated his pension entitlement to be slightly less than $44,000, based upon a Social Security offset figure of $679. Upon his retirement, however, ACS allegedly altered its method of calculating Dr. Passer's entitlement, substituting a lower Social Security offset figure and thereby boosting Dr. Passer's pension income just over the $44,000 threshold. Dr. Passer contends that, notwithstanding ACS's eleventh-hour efforts to inflate his benefits, he remains "entitled," under a proper application of the pension plan, to only the smaller figure originally calculated by ACS.

The District Court acknowledged that there was a "dispute between the parties ... over how to properly calculate the social security offset under the ACS's pension plan." *Passer*, 749 F.Supp. at 286. The court found it unnecessary, however, to resolve Dr. Passer's claims of manipulation, and thus the parties' dispute over Passer's genuine "entitlement" under the pension plan, on the grounds that the statutory exemption does not prohibit such manipulation, so long as the retiree is unconditionally provided at least $44,000 annually. *See id.* By the District Court's reading of the statute, so long as the retiree "is actually receiving more than $44,000," [9] it is immaterial whether he is in fact "entitled" to that sum by the terms of the governing pension plan. *See id.* In this, the District Court erred.

The terms of the statute itself make clear that the relevant retirement income for purposes of the exemption is that to which the employee is *"entitled ... from a pension, profit-sharing, savings, or deferred compensation plans."* 29 U.S.C. § 631(c)(1) (emphasis added). Regulations promulgated by the EEOC interpreting the provision reiterate that "[t]he *only* retirement benefits which may be counted towards the $44,000 annual benefit are those from a pension, profit-sharing, savings, or deferred compensation plan...." 29 C.F.R. § 1627.17(d) (1990) (emphasis added). It thus could not be plainer that the $44,000 received by the exempted retiree must be *due* under the terms of the applicable retirement plan; the language of the statute squarely refutes the appellee's contention that Congress meant to require only that the employer unconditionally promise to pay a certain annual sum, as a sort of "golden parachute" by which it might purchase the right to discriminate on the basis of age.[10]

---

9. The District Court emphasized that the retirement income Dr. Passer was receiving was derived from pension funds, *see* 749 F.Supp. at 286, but did not resolve whether those funds were being *properly* paid under the terms of the pension plan. Instead, it concluded:

> Congress required a $44,000 pension for an employee to qualify as a bona fide executive, and Congress' intent is not being thwarted when plaintiff is actually receiving more than $44,000.

*Id.*

10. To the extent that the statutory language admits of any ambiguity, our interpretation is reinforced by the provision's legislative history. Congress' intention to prohibit artificial adjustments to retirement income in order to fit an employee within the terms of the exemption may be inferred from its explicit desire to prohibit employer manipulation elsewhere in the same provision. The statute's requirement that the employee have held a "bona fide executive ... position" for two years prior to retirement was added by the House–Senate conference committee for the express purpose of "prevent[ing] an employer from circumventing the law by appointing an employee to a bona fide executive or high policymaking position shortly before retirement in order to permit compulsory retirement of that employee." H.R.CONF.REP. No. 950, 95th Cong., 2d Sess. 9, *reprinted in* 1978 U.S.CODE CONG & ADMIN.NEWS 530. Congress' concern with such manipulation under the job-functions prong of the exemption reasonably

We also note in this connection that the EEOC, the agency charged by Congress with administering ADEA, *see Public Employees Retirement System of Ohio v. Betts*, 492 U.S. 158, 171, 109 S.Ct. 2854, 2863, 106 L.Ed.2d 134 (1989), shares our construction of the statute's "bona fide executive" exemption, *see* Brief of the Equal Employment Opportunity Commission as Amicus Curiae at 16–22. Accordingly, "[t]he EEOC's view reinforces our own independent reading of the statute." *Hopkins v. Price Waterhouse*, 920 F.2d 967, 979 (D.C.Cir.1990) (taking note of the EEOC's interpretation of Title VII in construing the remedial reach of that statute).

■ Consequently, we find that the District Court erred in concluding that it was irrelevant under the statute whether an employer had artificially adjusted an employee's post-retirement income in order to push it over the statutory threshold. As a result of this legal error, the District Court was able to side-step a material dispute of fact between the parties over whether Passer is genuinely entitled, by the terms of the governing pension plan, to at least $44,000 in annual retirement income. Accordingly, we reverse the District Court's grant of summary judgment against Passer's claim of age discrimination under ADEA and remand for a determination of Passer's true entitlement under the terms of the pension plan.

### B. *The Retaliation Claims*

#### 1. *ADEA*

ADEA makes it

> unlawful for an employer to discriminate against any of his employees ... because such individual ... has opposed any practice made unlawful by this section, or because such individual ... has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d) (1988). This provision is parallel to the anti-retaliation provision contained in Title VII of the Civil Rights Act

of 1964, 42 U.S.C. § 2000e–3(a) (1988), and cases interpreting the latter provision are frequently relied upon in interpreting the former. *See, e.g., Merrick v. Farmers Ins. Group*, 892 F.2d 1434, 1441 (9th Cir.1990); 2 H. EGLIT, AGE DISCRIMINATION § 16.23, at 16–48 (rev. ed. 1991).

ACS freely admits that it decided to postpone indefinitely the symposium honoring Dr. Passer because Dr. Passer had filed discrimination charges against ACS. There is therefore no doubt that Dr. Passer was engaging in protected conduct and that he was penalized because of it. There remain, however, two possible bases for finding ADEA's anti-retaliation provision inapplicable on these facts: (1) that the allegedly retaliatory action post-dated Dr. Passer's employment with ACS so that he was no longer an "employee" protected by the statute; and (2) that the penalty imposed was, as a matter of law, not the sort of adverse employer action proscribed by the statute. We find these positions to be specious.

■ With regard to the first issue, the District Court was clearly correct in concluding that Dr. Passer remained protected by the statute even after he was forced to retire and ceased to be an active employee of ACS. *See Passer*, 701 F.Supp. at 3. Although the statute bars retaliation only against "employees or applicants for employment," 29 U.S.C. § 623(d), "[t]he term 'employee' ... [has been] interpreted broadly: it includes a former employee as long as the alleged discrimination is related to or arises out of the employment relationship." *EEOC v. Cosmair, Inc.*, 821 F.2d 1085, 1088 (5th Cir.1987); *accord Sherman v. Burke Contracting, Inc.*, 891 F.2d 1527, 1531–32 (11th Cir.) (interpreting identical language in Title VII), *cert. denied,* —— U.S. ——, 111 S.Ct. 353, 112 L.Ed.2d 317 (1990); *Bailey v. USX Corp.*, 850 F.2d 1506, 1509–10 (11th Cir.1988) (Title VII); *Pantchenko v. C.B. Dolge Co.*, 581 F.2d 1052, 1054–55 (2d Cir.1978) (per curiam) (Title VII); *Rutherford v. American Bank of Commerce*, 565 F.2d 1162, 1165 (10th

---

suggests that it did not intend to permit employers to manipulate pension plans for the purpose

of retiring specific employees who would not otherwise fall within the exemption.

Cir.1977) (Title VII); *Dunlop v. Carriage Carpet Co.*, 548 F.2d 139, 142 (6th Cir.1977) (interpreting identical language in FLSA); 2 H. EGLIT, *supra*, § 16.04, at 2S–29 (Supp. 1991). To read the statute otherwise would be to deny protection to any person who has suffered discharge or termination due to unlawful discrimination. Obviously, Congress could not have intended such an absurd result.

■ On the second issue, however, we find that the District Court erred in holding that the cancellation of a major public symposium in an employee's honor cannot be an act of "retaliation as intended by the ADEA." *See Passer*, 701 F.Supp. at 3. The statute itself proscribes "discriminat[ion]" against those who invoke the Act's protections; the statute does not limit its reach only to acts of retaliation that take the form of cognizable employment actions such as discharge, transfer or demotion. As we have held in connection with Title VII's anti-retaliation provision, "to establish a prima facie case under section 704(a), a plaintiff must show: 1) that he or she engaged in activity protected by the statute; 2) that *the employer ... engaged in conduct having an adverse impact on the plaintiff;* and 3) that the adverse action was causally related to the plaintiff's exercise of protected rights." *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1423 (D.C. Cir.) (per curiam) (emphasis added), *supplemented on other grounds on reh'g*, 852 F.2d 619 (D.C.Cir.1988) (per curiam), *cert. denied*, 490 U.S. 1105, 109 S.Ct. 3155, 104 L.Ed.2d 1018 (1989). There is no reason for us to apply a different test of retaliation in connection with claims under ADEA.

Nor could a more restrictive reading of ADEA's anti-retaliation provision be squared with other cases that have found illegal retaliation in employer conduct that could not be described strictly as an "employment action." For example, it is well established that efforts by an employer to scuttle a former employee's search for a new job, such as by withholding a letter of recommendation or by providing negative information to a prospective employer, can constitute illegal retaliation within the meaning of ADEA and parallel anti-retaliation provisions. *See, e.g., Sherman*, 891 F.2d at 1532 (unlawful retaliation under Title VII to persuade a former employee's new employer to fire the employee); *Rutherford*, 565 F.2d at 1164–65 (unlawful retaliation under Title VII to inform prospective employer that former employee brought discrimination charges against former employer); *Dunlop*, 548 F.2d at 147 (same under FLSA); 3A A. LARSON & L. LARSON, EMPLOYMENT DISCRIMINATION § 99.70, at 21–101 (rev. ed. 1991) (Under ADEA, "the retaliatory action complained of need not be an employment action.") (footnote omitted); *cf. Lytle v. Household Mfg., Inc.*, 494 U.S. 545, 110 S.Ct. 1331, 1338, 108 L.Ed.2d 504 (1990) (reinstating former employee's claim of retaliation under 42 U.S.C. § 1981 (1988) against former employer who failed to provide complimentary job references and suggesting that such facts could also state a valid claim under Title VII's anti-retaliation provision); *Shehadeh v. C & P Tel. Co.*, 595 F.2d 711, 720–22 & n. 44 (D.C.Cir.1978) (analogizing to Title VII's anti-retaliation provision in concluding that the dissemination of adverse references by a former employer to a prospective employer based on the former employee's race or sex would constitute an illegal "employment practice" barred by Title VII).

We accept as true, for purposes of assessing the legal sufficiency of his claim, Dr. Passer's allegation that ACS's cancellation of the seminar humiliated him before the assemblage of his professional associates and peers from across the nation, and made it more difficult for him to procure future employment. On these facts, ACS clearly "engaged in conduct having an adverse impact on the plaintiff." *Berger*, 843 F.2d at 1423. ACS's action in aborting a "rare and prestigious," and highly public, honor for an employee on the eve of its occurrence simply cannot be dismissed, as the appellee would have us do, as the inconsequential withdrawal of a mere "gratuity."

We therefore reverse the District Court's judgment dismissing Dr. Passer's retalia-

tion claim under ADEA. Because we find that Dr. Passer has stated a cause of action for reprisal under the statute, we remand so that he may have an opportunity to pursue his claim and seek appropriate *redress*.

### 2. *The D.C.Human Rights Act*

██ The District Court also dismissed Dr. Passer's retaliation claim under the D.C.Human Rights Act,[11] apparently relying on two alternative grounds. First, the court held that, just as with ADEA, cancellation of a symposium in an employee's honor is not the sort of retaliatory act banned by the statute. *See Passer*, 701 F.Supp. at 3–4. Second, the court held that "Plaintiff cannot maintain an action for retaliation in the absence of a right protected or granted under the Act." *See Passer*, Civ. Action No. 87–1244, mem. order at 1 (footnote omitted), *reprinted in* App. 14.

We affirm the District Court's dismissal of Dr. Passer's claim under the D.C. Act on the second of these grounds only. The D.C. Human Rights Act bans retaliation only against a person "in the exercise ... of a[ ] right granted or protected" by the Act's substantive prohibition against discrimination. *See* D.C. CODE ANN. § 1–2525(a). Because Dr. Passer, at age 70, was not protected by the Act against employment discrimination, *see* D.C. CODE ANN. § 1–2502(2), we agree with the District Court that Dr. Passer was not protected against retaliation he may have suffered in asserting a groundless claim under that Act.

### III. CONCLUSION

For the reasons set forth above, we reverse the District Court's summary judgment against Dr. Passer's claim of age discrimination under ADEA and its dismissal of his reprisal claim under the same statute. We affirm, however, the trial court's dismissal of Dr. Passer's reprisal

claim under the D.C.Human Rights Act on the grounds that Dr. Passer was not asserting a right protected by the statute at the time of the allegedly retaliatory action. We remand the case for further proceedings consistent with this opinion.

*So ordered.*

---

11. The Act, in relevant part, provides:
 It shall be an unlawful discriminatory practice to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, or on account of having aided or encouraged any other person in the exercise or enjoyment of any right granted or protected under this chapter.
 D.C.CODE ANN. § 1–2525(a) (Repl.1987).