John T. COLBY, Plaintiff,

v.

The GRANITEVILLE
COMPANY, Defendant.

No. 85 Civ. 2490 (EW).

United States District Court,
S.D. New York.

May 29, 1986.

Field, Lomenzo & Turret, P.C., New York City, for plaintiff; Ira A. Turret, Kevin J. Nolan, of counsel.

Constangy, Brooks & Smith, Atlanta, Ga., Rosen & Reade, New York City, for defendant; Edward Katze, William K. Principe, Atlanta, Ga., Lawrence A. Blatte, New York City, of counsel.

OPINION

EDWARD WEINFELD, District Judge.

Plaintiff John T. Colby commenced this action alleging that his forced retirement at age 65 under defendant Graniteville Company's mandatory retirement policy violated the Age Discrimination in Employment Act ("ADEA").[1] Graniteville moves for summary judgment, asserting that Colby, who was Senior Vice President of Finance and Administration of the McCampbell Sales Division, came within an exemption under the ADEA which authorizes the compulsory retirement before age 70 of those employees who for the two years prior to retirement were "employed in a bona fide executive or a high policymaking position" and who are eligible for aggregate annual retirement benefits of no less than $44,000 per year.[2]

Colby was first employed by McCampbell and Company in or about 1947. After McCampbell and Company was acquired by Graniteville in 1962, it became the McCampbell Sales Division of Graniteville, thereby giving Graniteville a manufacturing division in Graniteville, South Carolina and a marketing division in New York City. Colby was promoted in 1970 to credit manager of McCampbell. In 1980 he was again advanced, this time to the position of Senior Vice President of Finance and Administration, the position he held until his retirement in 1984.

McCampbell's retirement policy provides that "an Employee who is in an executive position and whose retirement income is at a level which permits mandatory retirement at [age 65] under applicable law" may not continue his employment beyond the end of the year in which he reaches age 65. Colby was 65 on September 22, 1984 and, pursuant to the company's policy, was forced to retire effective December 31, 1984. Colby contends that Graniteville's employment practices constitute age dis-

---

**1.** 29 U.S.C. § 621 *et seq.*

**2.** 29 U.S.C. § 631(c)(1).

crimination in violation of the ADEA and he seeks compensatory and liquidated damages.

## DISCUSSION

In moving for summary judgment, defendant bears the burden of showing the absence of any genuine issues of material fact.[3] The rule is well-settled that the court's function is not to try issues of fact, but only to decide whether there are issues of fact to be tried.[4] Nonetheless, Rule 56 must be enforced in appropriate cases, otherwise the Rule becomes a "dead letter."[5] As our Court of Appeals recently noted, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to commercial or other areas of litigation."[6]

Preliminarily, the defendant moves for summary judgment on the ground that plaintiff's EEOC claim was not timely filed, thus barring this action. Under the ADEA, a victim of age discrimination in New York must file his charge with the EEOC within 300 days of the alleged unlawful practice.[7]

It is undisputed that plaintiff met with Swint, McCampbell's president, in January 1984, at which time he requested that he not be retired at age 65. Swint told Colby that the request would be considered and he would be advised of the decision.[8] It is also undisputed that on March 23, 1984,

Swint informed Colby that he would have to retire at the end of 1984; that his request had been denied. Plaintiff filed his EEOC complaint on December 5, 1984, less than 300 days after March 23rd, but more than 300 days after his January meeting.

The evidence is clear that Colby was aware of the company's mandatory retirement policy at least as early as January 1984, but he did not receive definite oral or written notice that he would be terminated until March 23rd. Our Court of Appeals has made clear that the 300-day limitations period commences when the employee receives definite notice of termination, not when he first learns of the discriminatory retirement policy.[9] Any other interpretation of the statute would lead to the "obviously undesirable result" that an employee would have to file an EEOC complaint within 300 days of commencing his employment, assuming that the retirement policy was made known to him at that time, even if his retirement was several decades away.[10] Moreover, absent an express indication that an employee will be retired at age 65 pursuant to the company's policy, it is not unreasonable for an employer, in its own interest, to keep a valuable employee in service or for an employee, who may consider his services well-nigh indispensable to expect the company to waive its policy and to continue him on the payroll beyond his 65th birthday, a situation that is not uncommon. The limitation period does

---

3. *See, e.g., Hamilton v. Smith*, 773 F.2d 461, 466 (2d Cir.1985); *Katz v. Goodyear Tire & Rubber Co.*, 737 F.2d 238, 244 (2d Cir.1984).

4. *See, e.g., Meiri v. Dacon*, 759 F.2d 989, 992 (2d Cir.1985); *Heyman v. Commerce & Indus. Ins. Co.*, 524 F.2d 1317, 1319–29 (2d Cir.1975).

5. *See Colan v. Continental Telecom, Inc.*, 616 F.Supp. 1521, 1525 (S.D.N.Y.1985), *aff'd mem.*, 788 F.2d 2 (2d Cir.1986). *Cf. Meinrath v. Singer*, 482 F.Supp. 457, 460 (S.D.N.Y.1979), *aff'd*, 697 F.2d 293 (2d Cir.1982); *Applegate v. Top Assoc. Inc.*, 300 F.Supp. 51, 53 (S.D.N.Y.1969), *aff'd*, 425 F.2d 92 (2d Cir.1970); *Schwartz v. Broadcast Music, Inc.*, 180 F.Supp. 322, 325 (S.D.N.Y. 1959).

6. *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

7. 29 U.S.C. § 626(d).

8. *See* Deposition of John Colby, tr. at 127.

9. *See O'Malley v. GTE Service Corp.*, 758 F.2d 818, 821 (2d Cir.1985); *Miller v. International Telephone & Telegraph Corp.*, 755 F.2d 20, 23 (2d Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985). Defendant's reliance on these cases is misplaced since in both cases it was undisputed that the employee had received notice that he would be terminated, separate and apart from his knowledge of the retirement policy.

10. *O'Malley*, 758 F.2d at 821.

not accrue until the employee is clearly informed that his services will be terminated in the year he reaches the age of 65 and the company policy enforced. Defendant's motion on the ground that plaintiff's claim is time-barred is denied.

■ The ADEA was amended in 1978 to permit compulsory retirement of individuals between 65 and 70 years of age who have been employed for the preceding two years in a "bona fide executive or a high policymaking position" and who are eligible to receive aggregate annual retirement benefits of at least $44,000. The EEOC has promulgated regulations interpreting "bona fide executive" and "high policymaking position." [11] To establish that plaintiff was a "bona fide executive" as defined in the regulations, defendant must show that plaintiff meets each of the following requirements: [12] plaintiff's primary duty consists of the management of the enterprise or of a department or subdivision; plaintiff customarily and regularly directs the work of two or more other employees therein; plaintiff has the authority to hire or fire other employees or his suggestions as to hiring, firing, advancement and promotion of other employees are given particular weight; plaintiff customarily and regularly exercises discretionary powers; and plaintiff does not devote more than 20% of his time to activities which are not directly and closely related to the performance of the work described above.

If plaintiff is shown to exercise these responsibilities, the EEOC regulations make clear that the exemption applies "only to a very few top level employees who exercise substantial executive authority over a significant number of employees and a large volume of business." [13] The Conference Committee Report on the ADEA amendments, quoted at length in the EEOC regulations, provides: "With respect to employees whose duties are associated with corporate headquarters operations, such as *finance*, marketing, legal, production and manufacturing ... the definition would cover employees who head those divisions." [14] The Conference Committee Report continues:

> In a large organization the immediate subordinates of the heads of these divisions sometimes also exercise executive authority, within the meaning of this exemption. The conferees intend the definition to cover such employees if they possess responsibility which is comparable to or greater than that possessed by the head of a significant and substantial local operation who meets the definition.[15]

■ It is undisputed that for the two-year period prior to his mandatory retirement, plaintiff Colby was Senior Vice President of Finance and Administration of the McCampbell Sales Division of Graniteville, located in New York City. The McCampbell organizational chart [16] shows plaintiff as one of three senior vice presidents, second in command only to the president of the McCampbell Sales Division, Samuel Swint. Swint reported only to the president of Graniteville. The organizational chart also shows the manager of accounting, the manager of administrative servic-

11. *See* 29 C.F.R. § 1625.12 (1985). To date, the "bona fide executive" exemption of the ADEA has been applied in only one reported case. In *Whittlesey v. Union Carbide Corp.*, 567 F.Supp. 1320 (S.D.N.Y.1983), *aff'd*, 742 F.2d 724 (2d Cir. 1984), Judge Leval held that Union Carbide's chief labor counsel was not a bona fide executive within the meaning of the ADEA. The plaintiff was one of six attorneys who reported to an assistant general counsel, who was one of eight who reported to the general counsel, who presumably reported to the president or a vice president. The facts of that case stand in sharp contrast to the undisputed facts here.

12. These requirements are adopted from 29 C.F.R. § 541.1, a regulation interpreting the Fair Labor Standards Act, which the Conference Committee on the 1978 amendments to the ADEA referred to as a guideline.

13. 29 C.F.R. § 1625.12(d)(2).

14. H.Conf.Rep. No. 95–950, 95th Cong., 2d Sess. 9 (1978) *reprinted in* 1978 U.S.Code Cong. & Ad.News 504, 531 (emphasis added).

15. *Id.*

16. *See* Defendant's Brief, Exh. A.

es, the manager of office services, the administrator of financial and cost analysis, and the administrator of credit all reported to plaintiff.

Colby was a participant in the company's Executive Compensation Plan, earning $62,000 per year plus benefits. He received a company car and was the only employee in the New York office to have a country club membership provided for him by the company.[17] While it is true that the level of compensation "is not determinative as to whether a position comes within the bona fide executive ... exemption," [18] it is one of a number of factors to consider, especially where, as here, high pay is accompanied by perquisites of office limited to a few individuals.

Of even more compelling force is the nature of Colby's responsibilities. Colby admitted during his deposition that defendant's interrogatory answer describing his responsibilities as Senior Vice President of Finance and Administration was accurate:

As Chief Financial Officer, plaintiff was responsible for establishing, implementing and enforcing the credit policies and practices of the Sales Division. He also directed the activities of the Accounting Department, Personnel Department and Administrative Services and Personnel....

In addition to his credit policymaking responsibilities, plaintiff was responsible for directing the activities of the Finance Department, which includes not only the credit and collection functions, but also the accounting function....

With respect to Administration, plaintiff was responsible for directing the ac-

tivities of the Personnel Department, Administrative Services and Data Processing....

In addition to the foregoing responsibilities, plaintiff was the chairman of one and a member of four other significant policy committees. He was chairman of the McCampbell Benefits Committee, which administered a "grandfathered" profit sharing plan for McCampbell personnel. He served as a member of the Compensation Committee, which met annually or semi-annually to conduct salary reviews of some McCampbell employees. Colby was one of only five permanent members of the McCampbell Operating Committee [19] and he served on the Planning Committee and the Education/Tuition Reimbursement Committee. Colby was also chairman of the Performance Appraisal Audit Committee and a member of the Capital Budget Committee, but he testified that neither of these two committees held any formal meetings.[20] In addition to each of his committee memberships, Colby participated in the weekly meetings of the McCampbell business directors.[21]

In a transparent attempt to minimize his status as a key executive, plaintiff denigrates his role as a member of the various committees. Thus, in the instance of the Compensation Committee, he minimizes the nature of his services with the statement that he "had no duties regarding this or any other committee other than attending its meetings, and my involvement with committees was not central to their function." [22] In effect, he characterizes himself as a mere figurehead. With respect to the

---

**17.** In a letter to the Court dated February 28, 1986, counsel for plaintiff stated: "Mr. Colby's membership in the Nassau Country Club was maintained entirely for its benefits to the Graniteville Company and was a necessary alternative to the corporate Golf Club membership that had initially been desired by the Company." Regardless of whether the company benefited from Colby's country club membership, the undisputed fact remains that he was the only employee in the New York office to have such membership.

**18.** *Whittlesey v. Union Carbide Corp.,* 567 F.Supp. 1320, 1326 (S.D.N.Y.1983), *aff'd,* 742 F.2d 724 (2d Cir.1984).

**19.** *See* Deposition of Colby, tr. at 210–13; Turret Aff., Exh. I, Memo dated October 15, 1981.

**20.** *See* Deposition of Colby, tr. at 214, 222–23; Turret Aff., Exh. I, Memos dated April 10, 1981 and September 8, 1981.

**21.** *See* Deposition of Colby, tr. at 208–10.

**22.** Affidavit of John Colby, para. 8.

Benefits Committee, of which he was chairman, Colby states that his "involvement with this committee was limited to attendance of its meetings and not central to its function"; that decisions were made without his involvement.[23] Plaintiff's attempt to diminish the importance of his duties as a bona fide executive not only flies in the face of the undisputed facts, but also common sense.

Plaintiff seeks to overcome the force of defendant's motion for summary judgment by arguing that the president of the McCampbell Sales Division, Swint, had the authority to approve or veto plaintiff's decisions, that the Standard Practice memoranda he drafted were dictated to him by Swint and he simply put them to paper at Swint's instructions, and that 90% of his time was devoted to credit department activities, rather than the other activities in his job description. In effect, plaintiff attempts to create the impression that he was nothing more than a middle-level credit manager acting as the amanuensis or scrivener for Swint.

The fact that Colby had to report to the president of the division and that the president could veto his decisions does not lead to the conclusion that he was not a bona fide executive. Under plaintiff's theory, only the top executive of the corporation would qualify as a bona fide executive since he could veto any other executive's decisions and ultimately all executives are accountable to him. While the bona fide executive exemption is to be construed narrowly, plaintiff's interpretation is not supported by the legislative history of the amendment previously referred to; it would effectively read the exemption out of the statute.

Even if Colby's disparaging remarks about the nature of his duties are accepted at face value, plaintiff was a bona fide executive within the meaning of the ADEA. While Colby disputes the degree of control he exercised over most of the departments he was responsible for, he does not contest his supervision of the credit department, which was responsible for credit decisions totalling approximately $320 million. The credit department consisted of the credit manager, three credit analysts and two clerical staff members. He testified during his deposition that the credit manager reported to him and that he left the day-to-day operations of the department to the credit manager.[24] The head of the accounting department reported to him, at least with respect to matters relating to credit,[25] as did the head of administration.[26] Those departments had staffs of six to eight and 31 employees, respectively.

The Standard Practices and other memoranda bearing Colby's name[27] show that McCampbell employees had to obtain Colby's approval for lines of credit exceeding $50,000, for extensions of credit payment dates, for cash rebates, and for contracts other than the Standard Printed Sales Contract. He was one of the executives who could approve cash advances and expenses for McCampbell employees and was one of only two people who could approve the expenses of Swint, the president of McCampbell.[28] As plaintiff acknowledged during his deposition, he was one of the four people constituting McCampbell's management team.[29]

Colby's self-serving, self-deprecating statements do not overcome the factual evidence establishing that he was a key executive of McCampbell. As the immediate subordinate of the president of McCampbell, Colby falls within the catego-

23. Affidavit of Colby, para. 9.

24. See Deposition of Colby, tr. at 106–07.

25. Id. at 104.

26. Id. at 107–08.

27. See generally Turret Aff., Exh. I.

28. See Deposition of Colby, tr. at 198.

29. See Deposition of Colby, tr. at 203–04; see also Standard Practice dated April 27, 1981 (Colby, Swint and two other executives were the only officers of McCampbell whose requests for vacations were approved by the Chairman and Chief Executive Officer of Graniteville).

ry of top level employees exempt from the ADEA's prohibition against compulsory retirement before age 70.[30]

One may hearken back through the years to our revered Learned Hand, who in his early days as a District Court Judge said: "No one would think of calling the manager in charge of the Chicago branch of a broker's office a 'clerk'—he himself least of all."[31] So, too, one who had the powers described above, who was chairman of one and a member of four other corporate committees, who passed upon credit extensions running into the hundreds of millions of dollars, and who had a car and a golf club membership provided to him by the company, could hardly be considered anything other than an executive. Defendant's motion for summary judgment is granted.[32] The Clerk is directed to enter an order dismissing the complaint.

So ordered.

---

30. Plaintiff does not dispute that Colby was entitled to a nonforfeitable retirement benefit equaling at least $44,000, as required by 29 U.S.C. § 631(c)(1).

31. *In re Albert O. Brown & Co.,* 171 Fed. 281, 281 (S.D.N.Y.1909).

32. Because the Court finds that Colby was a "bona fide executive," the Court does not address the other ground for defendant's motion: whether the retirement benefits already paid to plaintiff exceed any damages he would be entitled to if he prevailed in this action.