**William P. MORRISSEY, Plaintiff,**

**v.**

**The BOSTON FIVE CENTS SAVINGS BANK FSB, et al., Defendants.**

Civ. A. No. 93–11960–PBS.

United States District Court, D. Massachusetts.

Nov. 2, 1994.

David J. Kerman, Ropes & Gray, Robert H. Quinn, Quinn & Morris, Boston, MA, for plaintiff.

David M. Mandel, David J. Kerman, Ropes & Gray, Boston, MA, for defendants.

## MEMORANDUM AND ORDER

SARIS, District Judge.

### BACKGROUND

Plaintiff, William Morrissey, brought this employment discrimination action in state court after his employer, the Boston Five Cents Savings Bank, forced him to retire upon reaching his 65 birthday. Morrissey asserted claims against the Boston Five Cents Savings Bank and certain board members (collectively, "the Bank") under the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et. seq.*, Mass.Gen.L. ch. 151B § 4, and Mass.Gen.L. ch. 93, §§ 102–103. In September, 1993, the Bank removed the action to federal court under 28 U.S.C. § 1441. The Bank has now moved for summary judgment on all counts of the complaint.

On June 30, 1994, this Court held a hearing on the motion for summary judgment and ordered defendants to produce certain documents, including minutes of meetings of the board of directors, in response to plaintiff's affidavit pursuant to Fed.R.Civ.P. 56(f). Plaintiff supplemented his memorandum with additional affidavits, which the Court has considered to the extent they contained admissible evidence.

It is uncontested that the Bank required Morrissey to retire because of his age. The disputed issue of law to be decided is whether the Bank's action was permissible under a narrow exemption to the ADEA that allows an employer to compel the retirement, at age 65 or older, of certain employees in "high policymaking" positions who are entitled to a nonforfeitable pension benefit of at least $44,000. 29 U.S.C. § 631(c)(1).

For the reasons stated below, the Court concludes that there are no material issues of fact in dispute and that the defendants are entitled to judgment as a matter of law. The Court therefore ALLOWS the defendants' Motion for Summary Judgment.

## I. SUMMARY JUDGMENT STANDARD

A motion for summary judgment must be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "To succeed, the moving party must show that there is an absence of evidence to support the nonmoving party's position." *Rogers v. Fair*, 902 F.2d 140, 143 (1st Cir.1990). If this is accomplished, the burden then "shifts to the nonmoving party to establish the existence of an issue of fact that could affect the outcome of the litigation and from which a reasonable jury could find for the [nonmoving party]." *Id.* (citations omitted). The nonmovant cannot rest upon mere allegations. *Id.* Instead, the nonmoving party must adduce specific, provable facts that establish a triable issue. *Id.* Rule 56(e) "requires nonmovants to submit evidence that would be admissible at trial to oppose properly submitted motions for summary judgment." *Federal Deposit Ins. Corp. v. Fonseca*, 795 F.2d 1102, 1110 (1st Cir. 1986). "There must be 'sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.'" *Rogers, supra.*, quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986).

## II. FACTS

The following facts are undisputed.

William Morrissey began work as a Vice President at the Boston Five Cents Savings Bank in 1972. In the late 1970s, he was promoted to Executive Vice President of Corporate Affairs, one of the five highest positions in the Bank. His annual salary was $115,000 and he was the fifth highest paid officer at the Bank. Morrissey held this position until his forced retirement in 1992. The Bank had 800 employees.

As an Executive Vice President, Morrissey reported directly to the Bank's Chief Executive Officer. He attended all meetings of the Board of Directors. He also was one of six officers to attend the weekly Senior Officers Meeting. At these hour-and-a-half meetings, the officers heard reports about and discussed Bank policies and operations.

Morrissey was also a member of the asset/liability committee. At committee meetings, Morrissey heard reports from the Chief Financial Officer and from the head of loan origination, among others. The participants discussed mortgage growth, deposit growth, investment alternatives, balance sheet forecasts, the acquisition of assets and liabilities, capitalization requirements, and the Bank's three-year business plan. They also discussed strategies to reduce or manage the Bank's exposure to interest rate changes. Morrissey advised the committee on the requirements of applicable law and regulations.

In general, Morrissey's job description assigned him the responsibility for:

* following both state and federal regulations, reporting the influence or effect that these events have upon the business, and recommending action where appropriate

* developing sources of business for the Bank, both deposits and loans

* developing and bidding on merger and acquisition candidates, for example, meeting with the FDIC to bid on First American Bank for Savings in October, 1990.

During his last two years of employment with the Bank, Morrissey continued to perform these responsibilities.

In the summer of 1992, the CEO of the Bank informed Morrissey that he would be expected to retire after his sixty-fifth birthday, which would occur on September 29, 1992. On October 13, 1992, Morrissey received written notice of the Bank's intention to compel his retirement. Thirteen days later, Morrissey filed age discrimination claims with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission. At the time he received written notice of his forced retirement, Morrissey was eligible to receive $38,-352 annually in nonforfeitable pension payments. He was also eligible, through a supplemental executive retirement plan ("SERP"), to receive $17,592 annually in pension payments that could be forfeited for reasons specified in his contract. He was not then entitled to $44,000 in nonforfeitable pension benefits.

The parties disagree on the timing of the events that followed, but the dispute is not material. Taking the facts as stated by Morrissey, the non-moving party, it appears that on or about October 28, 1992, the Bank received notice of Morrissey's age-discrimination claim. After receiving this notice, on October 29, 1992, the Executive Committee voted to alter Morrissey's pension plans so that $6,000 of the forfeitable SERP payments would be deemed nonforfeitable commencing with his retirement on November 1, 1992.

> Voted: That William P. Morrissey be and he hereby is granted an annual nonforfeitable retirement benefit from the Executive Supplemental Benefits Plan of $6,000 commencing with his retirement on November 1, 1992 and that the Bank hereby irrevocably waives the conditions of Paragraph 5 of said Plan with respect to William P. Morrissey, to the extent of $6,000 of annual retirement benefits.

This action increased to slightly over $44,-000 the nonforfeitable pension payments that Morrissey was entitled to receive immediately upon retirement.

On November 1, 1992, Morrissey was forced to retire.

## III. ANALYSIS

### A. *Claims of Age Discrimination*

 The ADEA protects employees between the ages of 40 and 70 from age-based employment discrimination. An amendment to the ADEA, however, allows for compulsory retirement, at age 65 or older, of any employee who,

for the two-year period immediately before retirement, is employed in a bona fide executive or a high policymaking position, if such employee is entitled to an immediate nonforfeitable annual retirement benefit from a pension, profit-sharing, savings, or deferred compensation plan, or any combination of such plans, of the employer of such employee, which equals, in the aggregate, at least $44,000.

29 U.S.C. § 631(c)(1) (1988). The Massachusetts statute relevant to this case, Mass. Gen.L. ch. 151B § 4(17)(b), contains equivalent language. It is the exclusive remedy under Massachusetts law for claims of age discrimination. *Woods v. Friction Materials, Inc.*, 30 F.3d 255, 264 (1st Cir.1994).

The Bank contends that Morrissey falls within the scope of this exemption because he was in a high policymaking position for the two years prior to his retirement and, on the day of his retirement, was immediately entitled to receive $44,000 annually in nonforfeitable pension benefits. Morrissey disputes both points.

### 1. *Exemption Requires High Policymaking Position*

 Although the ADEA itself does not define "high policymaker," the interpretive regulations issued by the EEOC on this exemption provide guidance for the courts. 29 C.F.R. § 1625.12. These regulations are particularly instructive on Congress's intent because they incorporate, verbatim, much of the language from the Conference Committee Report. H.Conf.Rep. No. 950, 95th Cong., 2d Sess. 8–10 (1978), *reprinted in* U.S.Code Cong. & Adm. News 504, 530–31.

The regulations state that the exemption is to be narrowly construed, and that "the burden is on the one seeking to invoke the exemption to show that every element has been clearly and unmistakably met." 29 C.F.R. § 1625.12(b). According to the EEOC, the phrase "high policymaking position"

is limited to "certain top level employees who are not 'bona fide executives'...." Specifically, these are: individuals who have little or no line authority but whose position and responsibility are such that they play a significant role in the development of corporate policy and effectively recommend the implementation thereof.

29 C.F.R. § 1625.12(e), *quoting* H.Rep. No. 95–950, p. 10. As an example, the regulations suggest that a chief economist or chief research scientist would be considered a high policymaker:

His duties would be primarily intellectual as opposed to executive or managerial. His responsibility would be to evaluate significant economic or scientific trends and issues, to develop and recommend policy direction to the top executive officers of the corporation, and he would have a significant impact on the ultimate decision on such policies by virtue of his expertise and direct access to the decisionmakers.

*Id.*

Based on these examples in the regulations, the Court concludes that Morrissey's position as Executive Vice President falls squarely within the definition of a high policymaker. Morrissey had direct access to the top decisionmakers, he was responsible for evaluating significant legislative and regulatory trends and issues and working with legislators on these issues, and he recommended policy on acquisitions and mergers, capitalization, and other areas of importance to the Bank. If Morrissey's position, the fifth highest in the Bank, were not to qualify as a high policymaking position, it would be difficult to find a position that did.

Morrissey attempts to evade the reach of the exemption by down-playing his participation at meetings and denigrating his overall effectiveness at his job. For example, although he concedes that he recommended to the senior officers that they bid on acquiring the First American Bank, he states that his opinion as to the amount of the bid was

ignored and a much higher bid was eventually submitted without his input. In essence, Morrissey contends that because his recommendations were often ignored, and others were more effective in actually shaping policy in areas critical to the bank, he should not be considered a high policymaker.

The Court cannot agree with this interpretation of the exemption. It is unlikely that Congress intended, in amending the ADEA, to allow compulsory retirement for only the most effective movers and shakers, while prohibiting such retirement for high level employees who have less impact, despite their significant responsibilities.

Other courts have likewise rejected any reliance on self-deprecating characterizations by an employee in order to determine whether the employee worked in a high policymaking position. For example, one court noted that

> if the organizational structure of the enterprise makes clear that the position in question serves a high policymaking function, courts should probably not allow the occupant to disavow the attributes of his position by seeking to prove, for example, that no one paid attention to his policy recommendations.

*Whittlesey v. Union Carbide Corp.*, 567 F.Supp. 1320, 1328 (S.D.N.Y.1983), *aff'd* 742 F.2d 724 (2d Cir.1984); *see also Colby v. Graniteville Co.*, 635 F.Supp. 381, 386 (S.D.N.Y.1986) (focusing on committee membership and job requirements rather than on "self-serving, self-deprecating statements"). In light of Mr. Morrissey's position based on the written job description and actual organizational position as well as his own deposition statements, the Court concludes that evidence concerning the effectiveness of his performance does not create a genuine issue of material fact.

For these reasons, the Court concludes that Morrissey qualified as a high policymaker as that term is used in § 12(c)(1) of the ADEA, and Mass.Gen.L. ch. 151B, § 4(17)(b).

### 2. *Exemption Requires $44,000 in Nonforfeitable Pension Income*

In order for an employee to be included within the exemption to the ADEA, the employee must be entitled to an immediate nonforfeitable annual retirement benefit of $44,000 from a pension plan or any combination of similar plans. 29 U.S.C. § 631(c)(1) (1988). In this case, the Bank contends that Morrissey met this requirement because, as of the day of his retirement, the combination of his pension benefits and SERP benefits amounted to slightly over $44,000 in nonforfeitable income. Morrissey challenges this contention on two grounds.

#### a. *Contractual Authority To Waive Forfeiture Conditions*

First, Morrissey questions whether the Directors had the contractual authority to alter his SERP plan as they did to make $6,000 of the benefits nonforfeitable. Specifically, Morrissey asserts that the Bank violated paragraph ten of the SERP, which states:

> The Bank may, at any time and from time to time, amend or terminate the Plan by vote of the Board of Investment; provided, however, that the Bank shall have no power to amend or terminate the benefits earned under the Plan by the Employee while still in the employ of the Bank, or retired and receiving or entitled to receive benefits, except as provided in paragraph 5 of this Agreement.

Paragraph 5 states four events in which payments "shall be forfeited", including situations in which the employee acts in a way inimical to the bank like working for a competitor. If the Bank's alteration of Morrissey's pension were to be invalidated, then Morrissey's remaining pension benefits would not meet the requirements of the ADEA exemption.

Morrissey's argument is unpersuasive, however, because the Bank did not in fact "amend or terminate" Morrissey's *benefits*. Rather, in making $6,000 of the benefits nonforfeitable, the Bank waived the "events" under which benefits would be forfeited. Morrissey was entitled to the same amount of benefits under both the old and amended versions of the SERP. This distinction be-

tween the amount of benefits and all other provisions of the Plan is made in paragraph ten itself, which allows the Bank to amend "the Plan" but prohibits any amendments to "benefits earned under the Plan." The Bank's construction of its contractual authority to waive the events triggering forfeiture without violating paragraph 10 is entitled to some deference in light of paragraph 9, which gives the Bank the "full power and authority to interpret, construe and administer" the Plan. The Court therefore concludes that the Bank did not violate paragraph ten of the SERP and the amendment to Morrissey's pension plan was valid.

b. *Statutory Authority to Make Benefits Non–Forfeitable*

■ Morrissey's second contention, related to his first, is that even if the Board had the *contractual* power to alter the forfeitability of his pension benefits, the statutory requirements for an exemption under the ADEA can not be met by last-minute manipulations of an employee's pension; to allow such manipulation would effectively eliminate the pension prong of the test created by Congress. This argument raises troubling questions of statutory interpretation, but, on the facts in this case, the Court concludes that the pension adjustment was valid under the ADEA, and that by making the adjustment, the Bank successfully brought Morrissey's position within the scope of the ADEA exemption.

In reaching this conclusion, the Court considered two possible interpretations of the pension requirement of the ADEA exemption. First, one could view the exemption as allowing compulsory retirement for high policymakers *provided that* these employees receive an adequate pension; that is, the pension prong of the exemption should be seen not as part of the test to determine *if* an employee can be retired, but rather as simply a requirement imposed on the employer to pay out $44,000 annually in benefits for every high policymaker compelled to retire. In essence, Congress simply told employers that they must take care of those who are forced out. Under this interpretation, an employer could permissibly create a pension

fund of $44,000 on the employee's last day of work; so long as the employee was immediately entitled to the pension upon retirement, the statutory requirements would be met regardless of when the pension fund was established.

Under an alternative interpretation of the statute, one could view *both* prongs of the exemption as part of the test used to determine whether compulsory retirement is appropriate. According to this theory, the pension prong of the test was established by Congress to create a bright-line rule for assessing the value that an employer places on any given employee's position. Thus, in order for the exemption to apply, an employee would have to be not only a high policymaker, but also the type of employee who was in a position to receive a nonforfeitable pension of $44,000. If this interpretation is correct, then an employer who created a pension fund (or increased the benefits in a fund) solely for the purpose of compelling an employee to retire would not be covered by the exemption to the ADEA. Such manipulation would thwart Congress's intent to use the level of an employee's pension fund as a benchmark for determining the importance of his position.

The plain language of the statute itself seems to favor the first interpretation: that the pension fund requirement serves a compensatory and not an evaluative function. This conclusion flows from the temporal restrictions Congress chose to include in the statute. On the one hand, Congress prevented manipulation of the high policymaker prong of the exemption by requiring that high policymakers serve for *two years* before the exemption applies; thus, promotions followed by quick retirement are not permissible. On the other hand, more modest time restrictions attach to the pension funds prong: Congress merely required that an employee be entitled to an *immediate* benefit of $44,000 annually upon retirement. If Congress viewed the existence and amount of a pension fund as a measure of an employee's status in the company, it could have created stringent temporal requirements for the pension fund prong as well. *Cf. Sagarino v. Town of Danvers,* 750 F.Supp. 51, 52

(D.Mass.1990) (applying the maxim *expressio unius est exclusio alterius* ). Its failure to do so undermines the argument that pension fund prong serves as a bright-line benchmark of an employee's value. Indeed, a contrary interpretation would have untoward results because it would afford an employer no guidance as to when it could modify its retirement plan in order to give older employees entitlement to a higher level of nonforfeitable benefits.

Few published cases address the exemption to the ADEA at all, and only one attempts to interpret the pension prong of the exemption. In that case, *Passer v. American Chemical Soc.*, 935 F.2d 322 (D.C.Cir. 1991), the employer had altered its method of calculating the employee's social security benefits so as to boost the employee's pension income over the $44,000 threshold. The court rejected this attempt to manipulate benefits to meet the ADEA exemption, holding:

> It thus could not be plainer that the $44,-000 received by the exempted retiree must be *due* under the terms of the applicable plan; The language of the statute squarely refutes the appellee's contention that Congress meant to require only that the employer unconditionally promise to pay a certain annual sum, as a sort of "golden parachute" by which it might purchase the right to discriminate on the basis of age.

*Passer*, 935 F.2d at 329 (emphasis added). In a footnote to this quoted passage, the Court explained its interpretation of the legislative history:

> Congress' intention to prohibit artificial adjustments to retirement income in order to fit an employee within the terms of the exemption may be inferred from its explicit desire to prohibit employer manipulation elsewhere in the same provision. The statute's requirement that the employee have held a "bona fide executive . . . position" for two years prior to retirement was added by the House–Senate conference committee for the express purpose of "prevent[ing]" an employer from circumventing the law by appointing an employee to a bona fide executive position or high policymaking position shortly before retirement

in order to permit compulsory retirement of that employee." H.R.Conf.Rep. No. 950, 95th Cong., 2d Sess. 9, *reprinted in* 1978 U.S.Code Cong. & Admin.News 530. Congress' concern with such manipulation under the job-functions prong of the exemption reasonably suggests that it did not intend to permit employers to manipulate pension plans for the purpose of retiring specific employees who would not otherwise fall within the exemption.

*Id.* at 329, n. 10. The Court held that there was a material dispute of fact as to whether the employee was "genuinely entitled by the terms of the governing pension plan to at least $44,000 in annual retirement income." Here, the Court concludes that there is no genuine issue of material fact as to Morrissey's entitlement to the threshold amount immediately upon retirement.

The Court therefore concludes that plaintiff Morrissey served in a high policymaker position exempt from coverage under the ADEA. The defendants are entitled to judgment on all counts alleging age discrimination (under the ADEA and equivalent Gen.L. ch. 151B) as a matter of law.

**B.** *Retaliation Claim*

■ Morrissey also alleges, in the remaining counts of the complaint, that the Bank's manipulation of his pension fund after receipt of his age discrimination claim amounted to impermissible retaliation under the ADEA.

■ The ADEA makes it unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section, or because such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d) (1988). A prima facie case under this section requires the plaintiff to show, among other things, that the employer's conduct "had an adverse impact on the plaintiff." *Passer*, 935 F.2d at 331.

■ Morrissey contends that altering the forfeitability conditions of his pension fund had an "adverse impact" on him because it

rendered legal what was otherwise an illegal act of age discrimination. The Court cannot accept this contention because retaliatory acts must involve conduct that imposes a penalty on the employee: demotions, adverse job recommendations, public humiliations. *See, e.g., Passer*, 935 F.2d at 331 (citing cases). Plaintiff has cited no case, and the Court is aware of none, in which a promotion or other action that improves an employee's employment benefits is considered retaliatory based on its adverse impact on plaintiff's ability to invoke statutory rights. Given the existing precedent, the Court concludes that the Bank's alteration of Morrissey's pension plan was not, as a matter of law, a retaliatory act under the ADEA.

## ORDER

For the foregoing reasons, the Defendants' Motion for Summary Judgment (Docket No. 5) is **ALLOWED.** The Clerk is directed to enter, in a separate document, a Final Order as follows:

For the reasons stated in the Memorandum and Order of this date, it is hereby **ORDERED**

Judgment for the Defendants, with costs.