**William P. MORRISSEY,**
**Plaintiff, Appellant,**

v.

**The BOSTON FIVE CENTS SAVINGS**
**BANK, et al., Defendants,**
**Appellees.**

**No. 94–2220.**

United States Court of Appeals,
First Circuit.

Heard April 6, 1995.

Decided May 15, 1995.

Robert H. Quinn, with whom John J. Morrissey and Quinn & Morris, Boston, MA, were on brief, for appellant.

Robert B. Gordon, with whom David M. Mandel and Ropes & Gray, Boston, MA, were on brief, for appellees.

Before BOUDIN, Circuit Judge, BOWNES, Senior Circuit Judge, and STAHL, Circuit Judge.

BOWNES, Senior Circuit Judge.

Plaintiff-appellant William Morrissey, a twenty-year employee of defendant-appellee Boston Five Cents Savings Bank, F.S.B. ("the Bank"), was involuntarily retired from his position as Executive Vice President for Corporate Affairs on November 1, 1992, approximately one month after his sixty-fifth birthday, and approximately one week after he filed age discrimination claims against the Bank and its holding company, the Boston Five Bancorp, with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission.

It is undisputed that the Bank forced Morrissey to retire because of his age. The question before us is whether the Bank's action was lawful under a narrow exemption to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–34 ("ADEA"), which permits compulsory retirement, at age sixty-five and older, of certain employees who occupy "bona fide executive" or "high policy-making" positions for the two-year period immediately preceding retirement, if such employees are entitled upon retirement to an immediate nonforfeitable annual retirement benefit of at least $44,000. *See* 29 U.S.C. § 631(c)(1). We answer this question in the affirmative, and therefore affirm the district court's order granting summary judgment in favor of the Bank.

## I. *Background*

On appeal from a grant of summary judgment, we view the facts and all inferences that may fairly be drawn from them in the light most favorable to the nonmoving party. *Coll v. PB Diagnostic Systems, Inc.*, 50 F.3d 1115, 1121 (1st Cir.1995).

The Bank hired Morrissey as a Vice President in June of 1972, and later promoted him to the position of Senior Vice President. In 1978 or 1979, the Bank's then Chief Executive Officer ("CEO"), Robert Spiller, promoted Morrissey to Executive Vice President for Corporate Affairs. Morrissey continued to hold this position until the Bank forced him to retire, at which time he was the fifth highest paid employee at the Bank.

In his capacity as Executive Vice President for Corporate Affairs, Morrissey reported directly to the CEO and was responsible for (i) monitoring state and federal regulations and advising the Bank with respect to the influence and effect of these regulations upon the business of the Bank, and recommending action where appropriate; (ii) developing and recommending merger and acquisition candidates; and (iii) developing sources of loan and deposit business for the Bank. In addition to these duties, Morrissey served as a member of the Asset and Liability Committee, and regularly attended the meetings of the Board of Directors. He also attended the weekly meetings of the Bank's six most senior officers ("Senior Officers Group").

In 1990, Robert Spiller retired and defendant Peter Blampied succeeded him as CEO. The Bank does not contest Morrissey's assertion that this event took place shortly before the statutory two-year period immediately prior to his involuntary retirement. By Morrissey's account, his role in the formulation of Bank policy was greatly diminished after Blampied took over as CEO. Morrissey contends, for example, that whereas under former CEO Spiller, the weekly meeting of the Senior Officers Group served as an opportunity for the officers to discuss and to participate in policymaking decisions, under CEO Blampied, this meeting ceased to serve the same policymaking function. Instead, all high policy decisions were made by the Board of Directors, or by a subset of senior officers that did not include Morrissey, which specifically excluded him from high policy discussions of important issues such as the Bank's distressed real estate holdings, its dealings with regulators, and its three-year strategic business plan. Morrissey also asserts that Blampied did not specifically solicit policy recommendations from him, and that, at his deposition, Blampied could recall specific comments by Morrissey with respect to only one policy matter.

On July 28, 1992, Blampied advised Morrissey that, in view of the fact that his sixty-fifth birthday was approaching, he should be thinking about retiring. Morrissey replied that he had no intention of retiring and that he could not afford to retire because he had to provide for his young family. Morrissey turned sixty-five on September 29, 1992. On October 6, 1992, Blampied again told Morrissey that, because he was sixty-five, he should be thinking of retiring. Blampied also suggested the possibility of a year-to-year paid consulting arrangement. The following day, Morrissey received a memorandum outlining this arrangement, to which he responded later in the day. Morrissey told Blampied that he had not agreed to the proposed arrangement and asked whether Blampied had consulted with any attorneys on the matter. Blampied replied that he had "checked every base," that he was going to "play hardball," and that the proposed consulting arrangement was rescinded. At some point during this meeting, Morrissey asked for the opportunity to review the matter with attorneys and other consultants.

On October 13, 1992, Morrissey received written notification that his retirement would be effective November 1, 1992. At the time of this notification, Morrissey was entitled to receive $38,352 annually in nonforfeitable pension benefits under his Qualified Benefit Plan ("QBP"), plus $17,592 annually in pension benefits under his Executive Supplemental Benefits Plan ("SERP"). The SERP benefits were forfeitable upon certain conditions specified in the contract. On October 26, 1992, Morrissey filed state and federal age discrimination claims with the Massachusetts Commission Against Discrimination and the Equal Employment Opportunity Commission. By his account, Morrissey gave the Bank written notice of these claims on his October 28, 1992 application for pension benefits.

On October 29, 1992, the Executive Committee of the Board of Directors held a special meeting via telephone conference, during which the Committee voted to waive irrevocably the forfeitability conditions of Morrissey's SERP as to $6,000 of the annual pension benefit to which he was entitled under that plan, as of November 1, 1992. The effect of the Committee's vote was to increase the total amount of Morrissey's nonforfeitable annual pension benefit from the $38,352 to which he was entitled under his QBP, to slightly more than the $44,000 mini-

mum required under the ADEA exemption. Morrissey was informed of the increase in the amount of his nonforfeitable pension benefit on October 30, 1992. On November 1, 1992, he was forced to retire.

■ On August 20, 1993 (after having been granted permission to withdraw his administrative claims), Morrissey filed suit in the Massachusetts Superior Court against the Bank, the Boston Five Bancorp, the individual members of the Executive Committee, and the administrators of the Bank's pension benefits plan.[1] The complaint alleged age discrimination and retaliation in violation of the ADEA, the Massachusetts Unlawful Discrimination Act, Gen.L. ch. 151B § 4, and the Massachusetts Equal Rights Under Law Act, Gen.L. ch. 93 §§ 102 and 103.[2] The Bank removed the case to the United States District Court for the District of Massachusetts pursuant to 28 U.S.C. § 1441, and subsequently filed a motion for summary judgment on all claims, which the district court granted.

## II. *Standard of Review*

■ On appeal, we review a grant of summary judgment *de novo*, evaluating the record in the light most favorable to the party opposing the motion, and drawing all reasonable inferences in that party's favor. *Coll*, at 1121. Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

■ "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). Material facts are those "that might affect the outcome of the suit under the governing law." *Id.* at 248, 106 S.Ct. at 2510. *See also Coll*, at 1121. A dispute as to a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (internal citations omitted).

## III. *Discussion*

Morrissey raises three issues on appeal. First, he argues that during the last two years of his employment with the Bank, he was not, in fact, a high policymaker within the meaning of the ADEA exemption, and that the district court erred by failing to apply a functional test to determine his status. Second, he contends that the district court erred in interpreting the pension benefit prong of the exemption so as to permit an employer to increase the amount of an employee's nonforfeitable pension benefit after the alleged act of discrimination in order to meet the statutory minimum amount. Finally, Morrissey argues that the district court's grant of summary judgment was improper because the supplemental affidavits he submitted in support of his Fed.R.Civ.P. 56(f) ("Rule 56(f)") motion demonstrated a genuine issue of material fact. Alternatively, he argues that, in view of these affidavits, the district court should have exercised its discretion under Rule 56(f) to defer judgment until he had an opportunity to depose the affiants. We address these issues in turn.

### A. *The Bona Fide Executive or High Policymaker Exemption*

The ADEA makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because

1. The individuals named as defendants are John R. Furman, William F. McCall, Jr., Richard J. Testa, George R. Baldwin, Peter J. Blampied, Allan W. Fulkerson, Ernest E. Monrad, Webster Collins, and Karen Hammond.

2. Mass.Gen.L. ch. 151B is the exclusive remedy under Massachusetts law for employment discrimination claims. *See Woods v. Friction Materials, Inc.*, 30 F.3d 255, 264 (1st Cir.1994). Thus, we need not consider the ch. 93 claims.

of such individual's age." 29 U.S.C. § 623(a)(1).[3] The prohibition applies only to individuals who are at least forty years of age. 29 U.S.C. § 631(a). The ADEA provides the following narrow exemption from this prohibition:

> Nothing in this chapter shall be construed to prohibit compulsory retirement of any employee who has attained 65 years of age and who, for the 2–year period immediately before retirement, is employed in a bona fide executive or a high policymaking position, if such employee is entitled to an immediate nonforfeitable annual retirement benefit from a pension, profitsharing, savings, or deferred compensation plan, or any combination of such plans, of the employer of such employee, which equals, in the aggregate, at least $44,000.

29 U.S.C. § 631(c)(1).

■ The parties agree that Morrissey was not a "bona fide executive" under the ADEA; the dispute concerns whether he was a "high policymaker." The ADEA itself does not define the term "high policymaking position," and few published opinions address the exemption. We find guidance, however, in the EEOC interpretive regulations set forth in 29 C.F.R. § 1625.12 (1994).

Section 1625.12(e) defines high policymakers as " 'certain top level employees who are not "bona fide executives," ' " and as " 'individuals who have little or no line authority but whose position and responsibility are such that they play a significant role in the development of corporate policy and effectively recommend the implementation thereof.' " 29 C.F.R. § 1625.12(e) (quoting H.R.Conf.Rep. No. 950, 95th Cong., 2d Sess. 10 (1978)). For example, the chief economist or chief research scientist of a corporation would likely be a high policymaker:

> His duties would be primarily intellectual as opposed to executive or managerial. His responsibility would be to evaluate significant economic or scientific trends and issues, to develop and recommend policy direction to the top executive officers of the corporation, and he would have a significant impact on the ultimate decision on

such policies by virtue of his expertise and direct access to the decisionmakers. Such an employee would meet the definition of a 'high policymaking' employee.

*Id.*

As to the scope of the exemption, § 1625.12(b) of the regulations admonishes that it should be construed narrowly, and that "the burden is on the one seeking to invoke the exemption to show that every element has been clearly and unmistakably met."

Morrissey does not dispute that, as Executive Vice President for Corporate Affairs, he held the title of a high policymaker. Indeed, he concedes that under former CEO Spiller, he was a high policymaker. Instead, he argues that the district court failed to apply the proper standard in its analysis and overlooked genuine issues of material fact. Morrissey's argument rests upon two premises, one legal and one factual. The legal premise is that the law requires that his status as a high policymaker be determined, not on the basis of what he calls the "appearances" or "trappings" of his position—i.e., title, salary, access to decisionmakers—but on the basis of his effectiveness as a policymaker, as judged by his actual impact on Bank policy and decisionmaking. The factual premise is that, although he may have been a high policymaker under former CEO Spiller, and while he continued to hold the same title until the Bank forced him to retire, he no longer functioned as a true high policymaker during the two-year statutory period, with Blampied as CEO.

We find that, even assuming *arguendo* the truth of Morrissey's legal premise and applying the effectiveness test he urges, the undisputed facts clearly demonstrate that he was a high policymaker during the relevant time period. Significantly, Morrissey does not dispute the following: (i) He reported directly to the CEO and had direct access to the Bank's decisionmakers. (ii) He attended the weekly meetings of the Senior Officers Group. (iii) He alone was responsible for monitoring state and federal legislative and

---

**3.** Because Massachusetts age discrimination law tracks federal law in all relevant respects, *see* Mass.Gen.L. ch. 151B § 4(1B), we will confine our discussion to federal law.

regulatory developments, and in that capacity recommended policies to ensure that the Bank remained in compliance with them. (iv) He worked closely with state legislators on legislation that was important to the savings bank industry, and that had a substantial impact on the welfare of the Bank. (v) He was responsible for monitoring and coordinating important tax litigation involving the Bank, and made recommendations regarding the choice of legal counsel to handle it. (vi) The Bank acted upon Morrissey's strong recommendation that it lower the interest rate on its passbook savings accounts. (vii) He recommended that the Bank acquire the First American Bank. (viii) He was responsible for the sale of the Bank's deposits in a branch office.

Even assuming that a high policymaker within the meaning of the ADEA must function at some minimum level of effectiveness, Morrissey was more than effective enough to make precise line-drawing unnecessary here. As the district court stated:

> Morrissey had direct access to the top decisionmakers, he was responsible for evaluating significant legislative and regulatory trends and issues and working with legislators on these issues, and he recommended policy on acquisitions and mergers, capitalization, and other areas of importance to the Bank. If Morrissey's position, the fifth highest in the Bank, were not to qualify as a high policymaking position, it would be difficult to find a position that did.

*Morrissey v. Boston Five Cents Sav. Bank, F.S.B.,* 866 F.Supp. 643, 647 (D.Mass.1994).

Given our conclusion, based on the undisputed facts, that Morrissey was a high policymaker during the statutory two-year period, we need not dwell on his argument that the district court failed to apply the "functional analysis" set forth in *Whittlesey v. Union Carbide Corp.,* 567 F.Supp. 1320 (S.D.N.Y. 1983), *aff'd,* 742 F.2d 724 (2d Cir.1984) (concluding that the test Congress intended is "one of function," and rejecting the argument that plaintiff's high salary and title as chief labor counsel automatically brought him within the ADEA exemption). We note, however, that the court in *Whittlesey* antici-

pated and rejected Morrissey's attempt to turn the functional test into a test of policymaking *effectiveness:*

> I would be inclined to agree that if the organizational structure of the enterprise makes clear that the position in question has bona fide executive rank or serves a high policymaking function, courts probably should not allow the occupant to disavow the attributes of his position by seeking to prove, for example, that no one paid attention to his policy recommendations or followed his executive orders. But such considerations are not involved in this dispute.

*Id.* at 1328. *See also Colby v. Graniteville Co.,* 635 F.Supp. 381, 386 (S.D.N.Y.1986) ("Plaintiff's attempt to diminish the importance of his duties as a bona fide executive not only flies in the face of the undisputed facts, but also common sense."). Moreover, as the district court below stated, "[i]t is unlikely that Congress intended, in amending the ADEA, to allow compulsory retirement for only the most effective movers and shakers, while prohibiting such retirement for high level employees who have less impact, despite their significant responsibilities." *Morrissey,* 866 F.Supp. at 648.

It follows from this analysis that any remaining facts that truly are in dispute are not material. *Anderson,* 477 U.S. at 247–48, 106 S.Ct. at 2510.

**B. *The Pension Benefit Prong of the High Policymaker Exemption***

■ The ADEA exemption applies only "if [the high policymaker] is entitled to an immediate nonforfeitable annual retirement benefit from a pension, profit-sharing, savings, or deferred compensation plan, or any combination of such plans, of the employer of such employee, which equals, in the aggregate, at least $44,000." 29 U.S.C. § 631(c)(1). The Bank contends that this requirement has been satisfied because, as of the first day of his retirement, Morrissey was immediately entitled to receive slightly more than the statutory minimum nonforfeitable annual benefit through a combination of his QBP benefit and the nonforfeitable portion of his SERP benefit. Morrissey argues that

the requirement has not been met because the law forbids "last-minute manipulations of the pension benefit to bring an employee within the exemption." The district court's analysis of the intended function of the pension benefit provision compels us to agree with the Bank.

The district court considered two possible interpretations of the pension benefit prong. Under one interpretation, the exemption would apply to employees who qualify as high policymakers *"provided that* these employees receive an adequate pension." *Morrissey*, 866 F.Supp. at 649. This view holds that the pension benefit prong is not "part of the test to determine *if* an employee can be retired, but rather [i]s simply a requirement imposed on the employer to pay out $44,000 annually in benefits for every high policymaker compelled to retire." *Id.* Under the second interpretation, *both* the job function and pension benefit prongs of the exemption comprise the test to determine whether compulsory retirement is permitted. *Id.*

We think the first interpretation is more faithful to the statute. After all, Congress did not impose the same two-year minimum on both prongs of the exemption. By the district court's analysis, the exemption contains two distinct temporal restrictions, one of which applies to the high policymaker prong, and the other of which applies to the pension benefit prong:

> On the one hand, Congress prevented manipulation of the high policymaker prong of the exemption by requiring that high policymakers serve for *two years* before the

exemption applies; thus, promotions followed by quick retirement are not permissible. On the other hand, more modest time restrictions attach to the pension funds prong: Congress merely required that an employee be entitled to an *immediate* benefit of $44,000 annually upon retirement.

*Id.*

Had Congress meant for both prongs to be subject to the two-year minimum, it presumably would have limited the exemption to the employee who "for the 2–year period immediately before retirement, is employed in a ... high policymaking position, [*and*] ... is entitled to an immediate nonforfeitable annual retirement benefit...." That, however, is not what Congress wrote. Under the ADEA, the high policymaker who is compelled to retire need only be entitled to the statutory minimum amount in nonforfeitable annual pension benefits immediately upon retirement.

In sum, we find the district court's analysis to be persuasive and consistent with what the plain language of the exemption would seem to require.[4]

### C. *The Rule 56(f) Motion*

■ In opposition to the Bank's motion for summary judgment, Morrissey submitted a Rule 56(f) affidavit, urging that summary judgment be denied or, alternatively, deferred on the ground that he had not had an opportunity to engage in "meaningful discovery."[5] At the summary judgment hearing,

---

4. Our reading of the exemption forecloses Morrissey's other argument, that both prongs of the exemption must be satisfied at least as of the date the employee receives notice of his involuntary retirement. Morrissey characterizes the date of notice of retirement as the time of the act of discrimination. As we construe the statute, as long as the employee is entitled to the statutory minimum benefit as of the day of his involuntary retirement, and as long as the employee is otherwise within the exemption, the act of compelling the high policymaking employee to retire does not constitute an act of discrimination.

  It also forecloses his argument that the Bank's modification of his benefits should be viewed as "manipulation." In support of this argument, Morrissey urges the case of *Passer v. American Chem. Soc'y*, 935 F.2d 322 (D.C.Cir.1991). As the district court noted, *Passer* is distinguishable

from the case before us because it involved "a material dispute of fact as to whether the employee was *'genuinely entitled by the terms of the governing pension plan* to at least $44,000 in annual retirement income.'" *Morrissey*, 866 F.Supp. at 650 (quoting *Passer*, 935 F.2d at 330) (emphasis added). The "manipulation" in that case was a matter of interpretive and accounting legerdemain. Here, there is no question that Morrissey was genuinely entitled to at least this amount by the terms of his plan as amended.

5. Fed.R.Civ.P. 56(f) provides as follows:

  Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the applica-

the court responded to the Rule 56(f) affidavit by ordering the Bank to produce documents, including minutes of Board of Directors meetings that Morrissey had requested. The court also ordered Morrissey to file a more specific Rule 56(f) affidavit. Morrissey responded by filing a supplemental memorandum and affidavits by four individuals,[6] which he contends clearly demonstrated that he was removed from a high policymaking position when Blampied became CEO. The memorandum also requested permission to depose these individuals. On appeal, Morrissey contends that, because these affidavits demonstrated the existence of a genuine dispute of material fact, the district court should have denied or deferred summary judgment to allow for further discovery under Rule 56(f).

Rule 56(f) is the means by which a party opposing summary judgment may obtain a denial or deferral of judgment upon a demonstration of "an authentic need for, and an entitlement to, an additional interval in which to marshal facts essential to mount an opposition." *Resolution Trust Co. v. North Bridge Assocs.*, 22 F.3d 1198, 1203 (1st Cir. 1994). Although the rule is "intended to safeguard against judges swinging the summary judgment axe too hastily," *id.*, a party who seeks to invoke the rule must (i) make an authoritative and timely proffer; (ii) show good cause for the failure to have discovered these essential facts sooner; (iii) present a plausible basis for the party's belief that facts exist that would likely suffice to raise a genuine and material issue; and (iv) show that the facts are discoverable within a reasonable amount of time. *Id. See also Paterson–Leitch v. Massachusetts Mun. Wholesale Elec. Co.*, 840 F.2d 985, 988 (1st Cir. 1988). We review a district court's denial of a Rule 56(f) motion only for abuse of discretion. *Resolution Trust Co.*, 22 F.3d at 1203.

The supplemental affidavits support the argument that, under CEO Blampied, the

Bank's high policymaking group was no longer the Senior Officers Group, as it had been under CEO Spiller, but rather comprised a subset of senior officers that did not include Morrissey. These affidavits do not address any of the undisputed facts set forth *supra* that unequivocally establish that Morrissey was a high policymaker. Accordingly, the district court did not abuse its discretion by refusing to deny or defer summary judgment on the basis of these affidavits.

## IV. *Conclusion*

For the foregoing reasons, *we affirm the district court's order granting summary judgment for the Bank. Costs awarded to defendants.*

---

tion for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

**6.** The affiants were Vernon L. Blodgett, Senior Vice President and Treasurer of the Boston Five Bancorp from 1990–1993; J. Barbara Magnuson, Corporate Secretary at the Bank from 1986–1993; Melissa J. Howard, Vice President for Marketing from 1987–1993; and Robert Spiller, President and CEO of the Boston Five and the Boston Five Bancorp from 1970–1990.